Linnette MONAK; Stephen J. Monak, Executor of the Estate of Linnette L. Monak, deceased, Plaintiffs–Appellants,

v.

FORD MOTOR COMPANY, Defendant–Appellee.

No. 02–3099.

United States Court of Appeals, Sixth Circuit.

April 5, 2004.

Before GILMAN and GIBBONS, Circuit Judges, and JORDAN, District Judge.*

---

* The Honorable Leon Jordan, Senior United States District Judge for the Eastern District

JORDAN, District Judge.

Plaintiffs–Appellants, Linette Monak ("Monak")[1] and Stephen Monak, appeal the district court's grant of summary judgment to Defendant–Appellee Ford Motor Co. and dismissal of the case. Monak brought suit under Ohio law against her employer, Defendant–Appellee, Ford Motor Company ("Ford"), for intentional infliction of emotional distress, gender and disability discrimination, and harassment based on gender and disability. Stephen Monak brought a claim for loss of consortium. For the reasons that follow, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Linnette Monak began working for Ford in its Sandusky, Ohio, plant in 1987 as a temporary employee in the position of production supervisor. Ford hired her in March 1993 as an hourly assembler. Monak experienced a number of health problems during her employment. She was on medical leave for bilateral epicondylitis[2] from February 1994 until May 1995, when she returned to work without restrictions. In June 1995, Monak fell on the job and sustained contusions. After visiting the factory hospital where she refused Tylenol, Monak returned to her job and finished the shift. Monak took medical leave from June through August 1996 for foot surgery. Beginning in January 1997, Monak took another medical leave for back pain and eventually underwent spinal surgery. At the time Monak filed her lawsuit in district court in December 2000, she still had not returned to work.

Monak contends that she was mistreated by Ford when she returned from medical leave in 1995 because Ford refused to return her to the same job and shift she had before she left. Monak also contends that she was mistreated by several supervisors and other employees who were rude to her and at times yelled and screamed at her. Monak's list of offending behavior is extensive. However, the most significant incidents involve Superintendent Tom Cromer ("Cromer"); Gene Simon ("Simon"), a supervisor; Lacy Davis ("Davis"), a supervisor; Dr. Kelderhouse, the factory doctor; and the management representative at Monak's workers' compensation hearing.

Monak's complaints about Cromer began when she was a temporary worker in 1987 and 1988. According to her, Cromer unfairly criticized her work and played favorites. He also tried to put his arm around her, but she testified it was not done in a sexual manner and it was something he tended to do with his friends. In 1995 Monak had problems with Cromer over her work assignments when she returned from arm surgery. He refused to give her a steady job, and he told her that she had to continue to float or do the "flip-flop," which in her words was "a torture job." Monak also complaints that Cromer required her to work with a man named Wadsworth ("Wads") and that Cromer knew she would be uncomfortable working with Wads. Monak contends that she was harassed by Cromer in 1996 when she became a union representative because he showed favoritism toward his friends, and this made her union job more difficult.

of Tennessee, sitting by designation.

1. We were informed at oral argument that Linnette Monak died July 27, 2003. The Executor of her estate, Stephen J. Monak, has been substituted as a Plaintiff–Appellant in her place.

2. Epicondylitis is the "inflammation of the epicondyle or of the tissues adjoining the epicondyle of the humerus." *Dorland's Illustrated Medical Dictionary* 605 (29th ed.2000).

Monak's problems with Simon go back to 1987 and 1988 when, as a temporary employee, she criticized the part coming from his department. In response, he rode by her on his scooter and stared at her. Subsequent to being assigned to work with Wads, Monak got a position as an inspector in an area supervised by Simon. According to Monak, when she talked to a quality control person about problems with parts, Simon went to her office and tried to intimidate her. She described one time when Simon screamed at her to the point where she got a headache with nausea and went to the hospital. Several other employees testified that Simon treated everyone this way, man or woman.

At one point, Monak was transferred to a department supervised by Davis, who Monak says also screamed in her face and threatened her if she rejected any parts from his department. She contends that he threatened her on a daily basis and would stare at her. One worker testified, however, that Davis treated everyone this way, not just Monak.

Monak's complaints regarding Dr. Kelderhouse occurred in 1994 and 1995 while she was on medical leave for arm pain. According to Monak, he "badgered her," had a very bad bedside manner, demanded immediate answers to his questions, and treated people like they were nothing.

The incident with the workers' compensation representative occurred in October 1997 at Monak's workers' compensation hearing, which was held after she had begun a medical leave for her back problem. Monak contends the management representative pretended to play a violin while she described her problems. According to Monak, this incident made her realize that she had reached her limit and needed to find an attorney.

## II. ANALYSIS

### A. Standard of Review

This court reviews a district court's grant of summary judgment *de novo. See, e.g., Wade v. Knoxville Utils. Bd.,* 259 F.3d 452, 460 (6th Cir.2001). Summary judgment is appropriate when there is no genuine issue as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must determine whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Anderson,* 477 U.S. at 251–52.

### B. Intentional Infliction of Emotional Distress

#### 1. Statute of Limitations

■ The applicable statute of limitations for a claim of intentional infliction of emotional distress under Ohio law is the four-year limitation period in Ohio Revised Code § 2305.09. *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 453 N.E.2d 666, 672 (1983). Monak contends that the district court incorrectly applied this limitation period when it held that any actions comprising this tort that occurred prior to December 19, 1996,[3] were barred as a matter of

3. According to the district court's docket sheet, the complaint was filed December 29, 2000. Contained in the record are several misstatements concerning when the complaint was filed and when the claim for intentional infliction of emotional distress accrued. However, these discrepancies are not material to our analysis of the statute of limitations issue.

law. Based upon Monak's deposition testimony, the district court determined that she first experienced severe emotional distress on October 4, 1995, when Gene Simon yelled at her and she went to the hospital for pain and nausea. Therefore, the district court concluded that Monak's complaint had to be filed by October 1999.

Monak argues that intentional infliction of emotional distress is an ongoing tort and that in her case the statute of limitations did not begin to run until the tort was complete, i.e., when the last in the series of distress-causing events occurred in October 1997, the violin-playing incident. Monak contends that the violin incident marked the end of her ability to handle the severe distress and the point at which she felt the full impact of the serious emotional distress. Ford argues that, except for the violin-playing incident, the conduct about which Monak complains is barred by the statute of limitations.[4] Ford contends that Monak experienced the emotional effects of the conduct when it occurred.

Under Ohio law, "a cause of action for intentional infliction of emotional distress does not accrue until the tort is complete, that is, at the time the injury is incurred and the emotional impact is felt." *Biro v. Hartman Funeral Home,* 107 Ohio App.3d 508, 669 N.E.2d 65, 68 (1995). Monak relies on this authority to support her contention that the tort was not complete until the full impact of the distress-causing conduct was experienced at the violin-playing incident. In *Biro,* the plaintiff learned in 1992 that his father's remains had been recklessly interred in a mass grave in 1986 contrary to the family's wishes and at the direction of the defendant. The Ohio Court of Appeals held that the injury was incurred and the statute of limitations began to run when the plaintiff learned about the mishandling of his father's remains, not when the desecration of the remains occurred. The plaintiff actually suffered the injury of emotional distress at the time he learned about the mistreatment of his father's remains.

Unlike the plaintiff in *Biro,* Monak did not learn about the conduct directed at her years later. On the contrary, she was aware of all of the conduct about which she complains as it occurred, and she contemporaneously experienced its emotional impact. Each incident was a discreet event, and its emotional effects were immediate. Thus, the district court was correct in finding that any actions prior to December 19, 1996, are barred as a matter of law.

### 2. Substantive Claim

■ Monak also appeals the district court's separate finding that the conduct about which she complains does not meet the standard for intentional infliction of emotional distress as required by Ohio law. The district court did not confine its analysis to the most recent events. Rather, it considered the multiple incidents comprising Monak's claim for intentional infliction of emotional distress and held that they do not meet the requisite standard.

In order to recover for intentional infliction of emotional distress under Ohio law, a plaintiff must show that "(1) the defendant intended to cause emotional distress, or knew or should have known that the actions taken would result in serious emotional distress; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions proximately caused plaintiff's psychic injury; and (4) the mental anguish plaintiff suffered was serious." *Thatcher v. Goodwill Indus. of Akron,* 117

---

**4.** Monak does not argue that the violin incident standing alone is sufficient to sustain her claim for intentional infliction of emotional distress.

Ohio App.3d 525, 690 N.E.2d 1320, 1331 (1997); *see also Pyle v. Pyle,* 11 Ohio App.3d 31, 463 N.E.2d 98, 103 (1983).

When it recognized the tort of intentional infliction of emotional distress in *Yeager,* the Ohio Supreme Court looked to the Restatement (Second) of Torts:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Yeager,* 453 N.E.2d at 671 (quoting *Restatement (Second) of Torts* § 46 cmt. d (1965)).

This is a high standard. The conduct to which it is applied in this case includes the refusal to return Monak to her previous job and shift when she returned from a long medical leave, the refusal to give her a steady job, moving her to departments where she was uncomfortable with the supervisor, questioning how she dealt with quality control people, being stared at by supervisors, the badgering manner of the plant doctor, the hostility directed toward her when she rejected parts, verbal reprimands by supervisors, and the mocking conduct by defendant's representative at

Monak's workers' compensation hearing. The district court determined that, while the conduct considered cumulatively may be rude or demeaning, it does not rise to the extreme level of being considered outrageous, nor does it fall outside the bounds of decency. We agree. "As a matter of law, the conduct must be more than mere 'insults, indignities, threats, annoyances, petty aggressions, or other trivialities.'" *Mason v. United States Fid. & Guar. Co.,* 69 Ohio App.3d 309, 590 N.E.2d 799, 804 (1990) (quoting *Restatement (Second) of Torts* § 46 cmt. d (1965)). The conduct falls short of the "outrageous" standard called for under Ohio law. Therefore, even if the claim for intentional infliction of emotional distress were not barred by the statute of limitations, it would still fail on the merits.

## C. Gender Discrimination

Under Ohio law, it is unlawful for an employer to discriminate against an individual on the basis of sex.[5] The Ohio Supreme Court has held that evidence sufficient to support a finding of discrimination under Title VII of the Civil Rights Act of 1964 is required to show a violation of § 4112.02(A). *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 66 Ohio St.2d 192, 421 N.E.2d 128, 131 (1981).[6]

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden

---

**5.** Ohio Rev.Code § 4112.02 provides:

It shall be an unlawful discriminatory practice:

(A) For any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

**6.** Ohio courts apply the burden-shifting framework propounded by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, (1973) for cases brought under state law. *See, e.g., Twinsburg City Sch. v. Ohio Civil Rights Comm'n,* 86 Ohio App.3d 527, 621 N.E.2d 591, 593 (1993). Because Monak alleges no direct evidence of discrimination, her claim is based on circumstantial evidence, and the *McDonnell Douglas* framework applies.

of demonstrating a prima facie case by a preponderance of the evidence. The plaintiff must show: "(1) membership in the protected class; (2) that she suffered an adverse action; (3) that she was qualified for the position; and (4) that she was replaced by someone outside the protected class or was treated differently from similarly situated members of the unprotected class." *Hoskins v. Oakland County Sheriff's Dep't,* 227 F.3d 719, 731 (6th Cir.2000) (quoting *Warfield v. Lebanon Corr. Inst.,* 181 F.3d 723, 728–29 (6th Cir.1999)). Once the plaintiff has established a prima facie case, an inference of discrimination arises. The burden of production at that point shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* The final burden is on the plaintiff to demonstrate that the employer's proffered reason for the adverse action was pretextual. *Id.* To do so, the plaintiff must prove "that the [employer's] asserted reasons have no basis in fact, that the reasons did not in fact motivate the discharge, or, if they were factors in the [employer's] decision, that they were jointly insufficient to motivate the discharge." *Burns v. City of Columbus, Dep't of Pub. Safety,* 91 F.3d 836, 844 (6th Cir.1996) (citations omitted).

### 1. Disparate Treatment

The district court held that Monak had not established a prima facie case of gender discrimination. Thus, the burden of production did not shift to Ford. The court determined that Monak only claimed that male employees received more favorable treatment than female employees; she never presented proof of that fact. The district court also found that Monak did not demonstrate that she suffered an adverse employment action.

■ We first address Monak's failure to demonstrate that she was treated differently from similarly situated males. Monak is required to "prove that all of the relevant aspects of [her] employment situation were 'nearly identical' to those of the [male] employees who [she] alleges were treated more favorably." *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994). Monak has failed to make the necessary showing. There is no evidence identifying the male employees whose employment situation Monak contends was nearly identical to hers, and therefore, she has made no showing that there were similarly situated males who were treated differently than she was. The co-worker deposition testimony on which Monak relies does not support her contention. For example, fellow employees testified that Cromer and Davis treated everyone, man or woman, the same way they treated Monak. We agree with the district court that Monak has not demonstrated that she was treated less favorably than male employees.

■ Monak's prima facie case of gender discrimination also fails because there is no showing that she experienced an adverse employment action.

[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Bowman v. Shawnee State Univ.,* 220 F.3d 456, 461–62 (6th Cir.2000) (quoting *Hollins v. Atl. Co.,* 188 F.3d 652, 662 (6th Cir. 1999)).

Monak contends that Ford's refusal to assign her to the same job and shift after she returned from a fifteen-month medical leave in May 1995 and Cromer's refusal to give her a steady job at that time constitute tangible job actions. We do not agree. These acts may have impinged upon Monak's job preferences or desired job status upon her return, but they do not rise to the level of an adverse change in the terms and conditions of her employment. "[D]e *minimis* employment actions are not materially adverse and, thus, not actionable." *Bowman,* 220 F.3d at 462 (citations omitted).

There is also no proof that these acts involved a detrimental change in Monak's pay, benefits, or on-the-job hours. Because Monak has failed to demonstrate an adverse employment action, she has failed on that basis to establish a prima facie case of gender discrimination.

### 2. Hostile Work Environment

■ Monak alleges that she was subjected to a hostile or abusive work environment based on her gender. A plaintiff can establish such a violation of Title VII without proving a tangible employment action, but she must demonstrate that the harassment was based on her sex and that it created a hostile work environment. *Bowman,* 220 F.3d at 462. The harassing conduct does not need to be sexual in nature. *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 565 (6th Cir.1999). However, when the alleged offensive conduct is non-sexual, the plaintiff must show that but for her sex she would not have been the object of the harassing behavior. *Id.; Bowman,* 220 F.3d at 463–64. Nevertheless, "Title VII does not prohibit all verbal or physical harassment from the workplace." *Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). "The critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.*

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotations and citations omitted). The work atmosphere created by the harassment must be both objectively and subjectively hostile. "[T]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman,* 220 F.3d at 463 (citing *Harris,* 510 U.S. at 21–22). Factors the court may consider in determining whether the complained-of conduct is severe or pervasive enough to constitute a hostile work environment include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris,* 510 U.S. at 23). While such factors may be instructive, the court ultimately looks to the totality of the circumstances in assessing whether the complained-of conduct is sufficient to constitute a hostile environment. *Williams,* 187 F.3d at 562.

Monak has presented a litany of incidents involving allegedly abusive conduct. However, none of the complained-of conduct is overtly or explicitly sexual in nature, and, therefore, she must present sufficient evidence to raise an inference that but for her sex she would not have been the object of the harassment. Monak has

not done that. While the behavior directed toward her may have been rude and demeaning, there is no basis to even infer that she suffered the unpleasant behavior because of her gender. As referenced above, co-worker testimony indicates that Davis and Cromer, whose conduct toward Monak was perhaps the most demeaning, treated everyone the same, whether the person be male or female.

### D. Disability Discrimination

Monak's claim for disability discrimination is brought pursuant to Ohio Rev.Code § 4112.02.[7] The Revised Code defines "handicap" as:

a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working; a record of physical or mental impairment; or being regarded as having a physical or mental impairment.

Ohio Rev.Code § 4112.01(A)(13).[8] "The definition of 'handicap' contained in R.C. 4112.01(A)(13) is limited to individuals who cannot perform 'everyday routine living and working without significantly increased hardship and vulnerability to what are considered the everyday obstacles and hazards encountered by the nonhandicapped.'" *Markham v. Earle M. Jorgensen Co.*, 138 Ohio App.3d 484, 741 N.E.2d 618, 626 (2000) (quoting *City of Columbus v. Ohio Civil Rights Comm'n*, 23 Ohio App.3d 178, 492 N.E.2d 482, 485–486 (2000)).

To establish a prima facie case of handicap discrimination under Ohio law, a plaintiff must demonstrate:

(1) that he or she was handicapped, (2) that an adverse employment action was taken by an employer, at least in part, because the individual was handicapped, and (3) that the person, though handicapped, can safely and substantially perform the essential functions of the job in question.

*City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St.3d 569, 697 N.E.2d 204, 206 (1998).[9]

The district court held that Monak was not disabled within the meaning of Ohio law. The court determined that Monak's requests for accommodation were at best attempts to accommodate her preferences, reasoning that her requests without work restrictions did not meet the requirements of the statute. The district court also held that Monak's bilateral epicondylitis was transitory because after surgery she returned to work without restrictions.

Although Monak presents a catalog of conduct which she contends supports her disability claim, she fails to establish a prima facie case. First, as already discussed, Monak has not demonstrated that she was subjected to an adverse employment action, and this finding applies equally to her disability claim. Monak offers no

---

7. *See supra* note 5.

8. This case arose under an earlier version of the statute that used the term "handicap" instead of the present term "disability." *See* Ohio Rev.Code § 4112.01 (amended 1999) (Historical and Statutory Notes) (substituting "disability" for "handicap").

9. Ohio courts look to the regulations and cases interpreting the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, for guidance in interpreting Ohio's disability law. *See McGlone*, 697 N.E.2d at 206–07. The Ohio courts also employ a burden-shifting framework in disability cases which begins with plaintiff presenting a prima facie case. *Markham*, 741 N.E.2d at 627. Because Monak did not establish a prima facie case, the district court's analysis did not recognize a shift in the burden of production to Ford.

additional or new conduct from that offered for her gender claim that explains or identifies the required adverse employment action based on her alleged disability. On that basis her claim fails.

■ Second, Monak has not demonstrated that she was disabled within the meaning of Ohio law. The district court found that Monak was not limited in the major life activity of working and she did not sustain her burden of proof as to any other major life activities. In addition to the reasons stated by the district court for its finding that Monak was not substantially limited in the major life activity of working, we note that Monak failed to show she was unable to perform a broad range of jobs. In *McGlone,* the Ohio Supreme Court addressed the factors that should be considered in assessing whether a person is substantially limited in the major life activity of working.

With respect to the major life activity of working:

> The term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

*McGlone,* 697 N.E.2d at 207 (emphasis in original) (citing 29 C.F.R. § 1630.2(j)(3)(i)).

Monak's contention that she was limited in other major life activities is not borne out in the record. The only supporting evidence she presents is her own conclusory testimony reflecting a personal belief that she was limited in other major life activities. This evidence is insufficient to raise a material question of fact and defeat summary judgment. *See, e.g., Maki v. Laakko,* 88 F.3d 361, 364 (6th Cir.1996)

("To preclude summary judgment, the nonmoving party must present evidence, beyond his pleadings and his own conclusory statements, to establish the existence of specific triable facts."). Monak's cursory argument that she was regarded as disabled is also not supported in the record and needs no additional discussion.

■ Monak additionally asserts a hostile work environment claim based on her alleged disability and relies on *Betosky v. Abbott Labs.,* No. 96APE03–373, 1996 WL 531934 (Ohio Ct.App. Sept. 19, 1996). In *Betosky,* the Ohio Court of Appeals recognized a hostile work environment theory in the context of disability discrimination, but rejected the plaintiff's claim. The Ohio court applied case law construing Title VII violations based on a hostile or abusive work environment and concluded that the complained-of conduct was not sufficiently severe or pervasive to constitute a hostile work environment. *Id.* at *5–8. The conduct at issue was similar to that complained about by Monak: unfair reprimands, criticism of job performance; laughter and mocking about plaintiff's injury; staring at plaintiff; and a department transfer based on employees not liking the plaintiff. *Id.* at *6–7.

In the present case, the alleged comments and acts related to Monak's physical condition were—based on the standards required by Title VII—not severe or pervasive enough to alter the terms and conditions of her employment and constitute a hostile work environment. The only conduct that can specifically be connected to Monak's physical condition is the poor bedside manner of the plant physician and the violin-playing incident. These incidents standing alone are insufficient to constitute an abusive work environment. The other conduct about which Monak complains and alleges to be connected to her disability

also fails to support her claim. Outside of her personal perceptions and conclusions, there is no evidence in the record that the complained-of conduct was related to a disability. For the reasons articulated in our discussion of Monak's gender discrimination claim, the disability claim based on the same conduct fails as well.

### E. Loss of Consortium Claim

 After dismissing all of Monak's claims, the district court dismissed Stephen Monak's loss of consortium claim. The district court was correct. A claim for loss of consortium is a derivative action that does not exist absent a primary claim. *Wang v. Goodyear Tire & Rubber Co.*, 68 Ohio App.3d 13, 587 N.E.2d 387, 391 (1990).

### III. CONCLUSION

For the reasons stated herein, we AFFIRM the judgment of the district.