RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0168p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MICHAEL THREAT; MARGARITA NOLAND-MOORE; PAMELA BEAVERS; LAWRENCE WALKER; REGINALD ANDERSON,

　　　　　　　*Plaintiffs-Appellants*,

*v.*

CITY OF CLEVELAND, OHIO; NICOLE CARLTON, Personally and in her official capacity as Commissioner,

　　　　　　　*Defendants-Appellees*.

┐
│
│
│
│  No. 20-4165
│
│
│
│
┘

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:19-cv-02105—James S. Gwin, District Judge.

Argued:  July 13, 2021

Decided and Filed:  July 26, 2021

Before:  SUTTON, Chief Judge; SUHRHEINRICH and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Jared S. Klebanow, KLEBANOW LAW, LLC, Cleveland, Ohio, for Appellants. William M. Menzalora, CITY OF CLEVELAND, Cleveland, Ohio, for Appellees.  Anna M. Baldwin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.  **ON BRIEF:**  Jared S. Klebanow, KLEBANOW LAW, LLC, Cleveland, Ohio, Brian Wolfman, GEORGETOWN LAW APPELLATE COURTS IMMERSION CLINIC, Washington, D.C., Avery Friedman, AVERY FRIEDMAN & ASSOCIATES, Cleveland, Ohio for Appellants.  William M. Menzalora, CITY OF CLEVELAND, Cleveland, Ohio, for Appellees.  Anna M. Baldwin, Tovah R. Calderon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.

_____

**OPINION**

_____

SUTTON, Chief Judge.  Five municipal employees sued the City of Cleveland and their supervisor under a host of federal and state grounds, the most prominent being that the city illegally determined night and day shifts based on the color of the officers' skin.  The district court rejected many of the claims at the pleading stage and rejected the unlawful discrimination claims at summary judgment.  Triable issues of fact remain over the anti-discrimination claims, however, because the employees' shifts count as "terms" of employment under Title VII.  We thus reverse that component of the district court's decision and affirm the rest.

I.

Reginald Anderson, Pamela Beavers, Margerita Noland-Moore, Michael Threat, and Lawrence Walker work for the City of Cleveland in its Emergency Medical Service division.  They are captains in the division, they belong to the same union, and, pertinent to this dispute, they are black.

Each fall, captains bid on their schedules for the upcoming year, choosing different days to work and opting for day or night shifts.  The city uses a seniority-based bidding system to assign shifts, giving longer-tenured captains shift preference.  The collective bargaining agreement also allows Nicole Carlton, the city's EMS Commissioner, to transfer up to four captains to a different shift, even if it conflicts with a captain's first choice.

In 2017, the captains bid on shift assignments for 2018.  The bidding process generated a schedule in which Anderson, Noland-Moore, and Walker were slated to work a day shift together.  That meant only black captains would staff the shift.  Exercising her power under the collective bargaining agreement, Carlton removed Anderson from that day shift and replaced him with a white captain to "diversify the shift[]."  R.29 at 69.  As it happens, the white captain's family visitation agreement prevented him from working that shift.  The scheduling conflict spurred Threat to phone Carlton on behalf of all the captains.  Threat explained the scheduling predicament and voiced his frustration with race-based assignments.

When these informal discussions went nowhere, Threat filed a discrimination charge with the Ohio Civil Rights Commission and with the federal Equal Employment Opportunity Commission on behalf of himself and his fellow black captains.  Carlton, meanwhile, asked the captains to rebid their preferences.  But the rebidding generated a schedule in which Anderson was slated for a day shift staffed only by black captains.  Carlton reassigned Anderson to a night shift.  She did so to "create diversity" among what otherwise would have been a day shift staffed entirely by black captains.  *Id.* at 83.

The conflict festered.  A local news station ran a story about the shift situation.  The story quoted Carlton's statements at a grievance hearing between the union and the city.  In response, the city filed an unfair-labor-practice charge with the Ohio Employment Relations Board, alleging that the union violated Ohio's Collective Bargaining Act.  According to the charge, several captains waged a media campaign against the city by leaking audio recordings.  The State Employment Relations Board investigated the city's unfair-labor-practice charge and made a preliminary finding in the city's favor.  The Board directed the city and the union to work out their differences in mediation.  The union agreed to refrain from disseminating recordings of conversations held during grievance meetings.

In 2019, the captains sued the city and Carlton in federal court.  They brought discrimination and retaliation claims under Title VII and Ohio law, § 1983 claims based on the federal constitution, and claims for intentional infliction of emotional distress under Ohio law.  The city and Carlton moved for partial judgment on the pleadings.  The court granted the motion in part, dismissing the state and federal retaliation claims, the § 1983 claims, the emotional distress claims, and the Title VII discrimination claims against Carlton but not against the city.  Left standing were federal discrimination claims against the city and state discrimination claims against the city and Carlton.

After discovery, the parties filed cross-motions for summary judgment on the discrimination claims.  The district court granted the city's and Carlton's motion.  The court acknowledged that transferring a captain to a different shift on account of race amounted to discrimination under Title VII.  But the claims failed anyway because the captains could not

show that the shift change subjected them to a "materially adverse employment action." R.53 at 7.

## II.

*Claims of Unlawful Discrimination under Title VII.* Do discriminatory shift changes based on race violate Title VII of the Civil Rights Act of 1964? We think so.

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). For today's purposes, the key words are "discriminate," "race," and "terms" and "privileges" of employment.

There is little room for debate that the city discriminated against the plaintiffs—that it treated them differently. *Webster's Third New International Dictionary* 648 (1961). When it comes to "discriminate," precedent and dictionaries row in the same direction. To discriminate under Title VII means to treat similarly situated individuals differently. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682–83 (1983).

There also is little room for debate that the city treated the black captains differently "because of" their "race." Carlton admitted that she switched out a black captain for a white one to adjust the shift's racial makeup. That counts as direct evidence of discrimination based on race. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997).

The main debate in this case turns on the meaning of "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Do the city's shift schedules amount to "terms" of employment? Does getting priority because of seniority in choosing shifts amount to a "privilege" of employment?

At one level, that seems easy. If the words of Title VII are our compass, it is straightforward to say that a shift schedule—whether, for example, the employee works the night shift or the day shift—counts as a term of employment. It's not even clear that we need dictionaries to confirm what fluent speakers of English know. A shift schedule is a term of

employment.  Surely an 8:00 start time is a term of employment.  And surely the distinction between an 8:00 a.m. and an 8:00 p.m. start time is a term of employment.  How could the *when* of employment not be a *term* of employment? A similar conclusion applies to "privileges" of employment.  Benefits that come with seniority may count as privileges of employment.  And losing out on a preferred shift may diminish benefits that a senior employee has earned.  *See NAACP, Detroit Branch v. Detroit Police Officers Ass'n*, 900 F.2d 903, 907 n.5 (6th Cir. 1990) ("In the area of labor relations, 'seniority' is a term that connotes length of employment. A 'seniority system' is a scheme that allots to employees ever improving employment rights and benefits as their relative lengths of permanent employment increase.").

Dictionary definitions contemporaneous with the enactment of Title VII confirm this reading.  *See Webster's Third New International Dictionary* 2358 (1961) (defining "terms" as "propositions, limitations, or provisions stated or offered for the acceptance of another and determining (as in a contract) the nature and scope of the agreement"); *id.* at 1805 (defining "privilege" as "a right or immunity granted as a peculiar benefit, advantage, or favor"); *Webster's New International Dictionary* 1969 (2d ed. 1934) (defining "privilege" as the same). Consistent with these definitions, a shift change fits comfortably within the statutory phrase. Moving an employee from the day to the night shift over the employee's seniority-based objection alters the "terms" and the "privileges" of an individual's employment.

Pulling the meaning of these key terms together, the city decided when Anderson had to work based on his race—and in the process discriminated against him based on race with respect to his terms and privileges of employment.  The race-based shift change controlled when and with whom he worked, prohibited him from exercising his seniority rights, and diminished his supervisory responsibilities when the city imposed the night shift on him.  All told, the action amounted to discrimination with respect to his terms and privileges of employment under § 703(a)(1).

The city and Carlton (collectively the city from now on) fight this conclusion on several fronts.  The first line of attack invokes our cases that construe the phrase "terms, conditions, or privileges of employment" in Title VII to cover only a materially "adverse employment action." *See, e.g.*, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008); *Laster v. City of*

*Kalamazoo*, 746 F.3d 714, 719 (6th Cir. 2014).  As the city sees it, no matter what "discriminate," "race," "terms," and "privileges" of employment mean, these shift changes do not rise to the level of materially adverse employment actions under our cases.

We do not see the same gap between the words of Title VII and our liquidation of those words.  The point of our cases is to convey that an employer's alteration of the "terms" or "privileges" of an employee's work is actionable only when it is "adverse" and "material" to the work.  To "discriminate" reasonably sweeps in some form of an adversity and a materiality threshold.  It prevents "the undefined word 'discrimination'" from "command[ing] judges to supervise the minutiae of personnel management."  *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005).  It ensures that a discrimination claim involves a meaningful difference in the terms of employment and one that injures the affected employee.  And it ensures that any claim under Title VII involves an Article III injury—and not, for example, differential treatment that helps the employee or perhaps even was requested by the employee. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021).  Surely those are reasonable assumptions.

At the same time, our approach honors a de minimis exception that forms the backdrop of all laws.  The "doctrine *de minimis non curat lex* (the law does not take account of trifles)" has "roots [that] stretch to ancient soil."  *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 233 (2014).  So ancient, the "old law maxim" was already venerable at the founding.  *Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 268 (1796).  From the beginning, the de minimis canon has been "part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept."  *Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992); *see Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000).

When Congress enacted Title VII, the National Legislature provided no indication that it sought to disregard these considerations or to use the word "discriminate" to cover *any* difference in personnel matters.  Yes, "hundreds if not thousands of decisions say that an 'adverse employment action' is essential to the plaintiff's prima facie case" even though "that term does not appear in any employment-discrimination statute."  *Minor v. Centocor, Inc.*,

457 F.3d 632, 634 (7th Cir. 2006). And, yes, the same could be said about a "materiality" requirement. But we take these innovations to be shorthand for the operative words in the statute and otherwise to incorporate a de minimis exception to Title VII.

But de minimis means de minimis, and shorthand characterizations of laws should not stray. Else, like "the children's game of telephone," we risk "converting the ultimate message into something quite different from the original message—indeed sometimes into the opposite message." *Sexton v. Panel Processing, Inc.*, 754 F.3d 332, 337 (6th Cir. 2014). "[T]o give the de minimis rule too broad a reach would contradict congressional intent by denying proper effect to a statute." *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 378 (4th Cir. 2011) (Wilkinson, J., concurring in part and concurring in the judgment). That concern, however, must be balanced against the reality that "we cannot just toss the de minimis rule aside." *Id.*

In this instance, employer-required shift changes from a preferred day to another day or from day shifts to night shifts exceed any de minimis exception, any fair construction of the anchoring words of Title VII, and for that matter any Article III injury requirement. Whether we refer to claims of discrimination based on race in "terms" or "privileges" of employment or to claims of discrimination based on race in "materially adverse" terms of employment, the conclusion is the same: They state a cognizable claim under Title VII when they refer to shift changes of this sort and under these circumstances.

That leads to the city's second line of attack. It points out that we have several decisions, many of them unpublished, that have said that shift changes do not count as materially adverse employment actions under Title VII. *See Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 482 (6th Cir. 2012); *Tepper v. Potter*, 505 F.3d 508, 516–17 (6th Cir. 2007); *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002); *Harper v. Elder*, 803 F. App'x 853, 857 (6th Cir. 2020); *Wade v. Automation Pers. Servs., Inc.*, 612 F. App'x 291, 300 (6th Cir. 2015); *Amann v. Potter*, 105 F. App'x 802, 808 (6th Cir. 2004); *Monak v. Ford Motor Co.*, 95 F. App'x 758, 765 (6th Cir. 2004); *Virostek v. Liberty Twp. Police Dep't/Trs.*, 14 F. App'x 493, 504 (6th Cir. 2001); *Miller v. Peck-Hannaford & Briggs Co.*, 142 F.3d 435 (6th Cir. 1998) (unpublished table decision); *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). Invoking these cases and related reassignment cases, the city makes a categorical argument—that "the Sixth

Circuit and its district courts have held that shift changes do not constitute adverse employment actions." Appellee Br. at 26.

But we have no such categorical rule. None of these cases creates an across-the-board directive that actionable discrimination claims never cover shift changes, whether in connection with seniority prerogatives or not. That is not what they say. Even *Kocsis*, one of the more frequently cited and far-reaching decisions in this line of cases, emphasizes the contextual nature of these inquiries. 97 F.3d at 886. It noted that "indices that might be unique to a particular situation" could show that the adverse action was "more disruptive than a mere inconvenience" or a mere "alteration of job responsibilities." *Id.* (quotation omitted).

Not all shift changes are the same. And some shift changes and reassignments may constitute, say, race-based discrimination in "terms," "privileges," and other aspects of employment. *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 919 (6th Cir. 2014); *Spees v. James Marine, Inc.*, 617 F.3d 380, 392 (6th Cir. 2010). That is just what happened here for the reasons already given.

The city worries that this approach will turn the anti-discrimination provision into a "general civility code" that federal courts will use to police the pettiest forms of workplace misconduct. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). But that is the point of the de minimis exception. Plus, the provision "protects an individual only from employment-related discrimination" based on a protected characteristic, not just any distinction in terms of employment. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61 (2006).

Also misplaced is the city's view that § 703(a)(1) reaches only employment decisions that cause the employee economic harm. Cabining the provision to pocketbook harms would render meaningless many of the words in the statutory phrase "compensation, terms, conditions, or privileges of employment." As the words after "compensation" suggest, Title VII indeed extends beyond "economic" discrimination. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64 (1986).

All in all, § 703(a)(1) means what it says and means what we have said it means, particularly when it comes to the context of each claim and the de minimis nature of any

exceptions to the language of the statute.  When an employee's race is a basis for a shift change that denies the privileges of that employee's seniority, the employer has discriminated on the basis of race in the terms and privileges of employment.

One loose end remains on this claim.  In contrast to Captain Anderson, the city did not alter the shifts of the other claimants.  They brought claims for unlawful discrimination on the ground that the city's race-based assignment policy affected their bidding schedule, controlled when and with whom they worked, reduced the benefits of seniority, and diminished their supervisory responsibility.  The district court did not review this theory, and we will allow it to do so in the first instance on remand.

*Claims of Unlawful Discrimination under the Ohio Civil Rights Act*.  The Ohio Civil Rights Act applies when an employer decides "to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."  Ohio Rev. Code § 4112.02(A).  Despite the differences in language, Ohio courts generally mimic their interpretation of O.R.C. § 4112 with the federal courts' interpretation of Title VII.  *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio C.R. Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981).  That requires us to reverse and remand the state law claims as well.

*Claims of Third-Party Retaliation under Title VII*.  Title VII's retaliation provision forbids actions that "discriminate against" employees because they "opposed" a practice that Title VII forbids or because they have "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing."  42 U.S.C. § 2000e-3(a).  Generally speaking, to establish a case for third-party retaliation under Title VII, the claimant must show that (1) her close contact engaged in a protected activity, (2) the employer took an adverse action against the employee because of the close contact's engagement in a protected activity, and (3) a causal chain links the materially adverse action to the protected activity.  *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011); *Nailon v. Univ. of Cincinnati*, 715 F. App'x 509, 516 (6th Cir. 2017).

But this theory of retaliation does not apply here—namely to a claim by these employees based on an unfair-labor-practice charge filed by the city against the union. The statute says that "a civil action may be brought . . . by the person claiming to be aggrieved," 42 U.S.C. § 2000e-5(f)(1), and thus "permits a person 'claiming to be aggrieved' to bring 'a civil action,'" *Thompson*, 562 U.S. at 175. But it does not permit an individual not aggrieved to sue for someone else's injury. *Thompson* "merely stands for the proposition that a person aggrieved by retaliation has standing to sue for it even if that person did not engage in the protected activity but someone else did." *Scheidler v. Indiana*, 914 F.3d 535, 543 (7th Cir. 2019). In this instance, when the city allegedly filed a retaliatory unfair-labor-practice charge against the union, that injured the union. And that action might have permitted the union to sue even if the alleged retaliation responded to actions of the employees. But that is not what happened here. The union never filed a retaliation lawsuit. Notably, the claimants have not identified any case in which *Thompson* was applied in this distinct setting. The district court correctly dismissed these claims under Civil Rule 12(c).

*Claims of Unlawful Retaliation under Ohio Law*. Ohio's retaliation provision, *see* O.R.C. § 4112.02(I), mirrors the federal counterpart, and Ohio courts use federal law to interpret the Ohio provision. *See Braun v. Ultimate Jetcharters*, *LLC*, 828 F.3d 501, 510 (6th Cir. 2016). We therefore affirm the district court's dismissal of the retaliation claims under Ohio law.

*Captain Beavers's Claim of Unlawful Retaliation*. Captain Beavers alleges that she brought a standalone retaliation claim against the city because it singled her out for selective enforcement of the city's attendance policy in retaliation for reporting Carlton's discriminatory behavior to management and her union stewards. But Beavers has forfeited this claim by failing to respond to the city's argument against it in its motion for judgment on the pleadings. *KSA Enters., Inc. v. Branch Banking & Tr. Co.*, 761 F. App'x 456, 463 (6th Cir. 2019).

*Equal Protection Claims*. The district court did not err when it dismissed the claimants' equal protection claims because they failed to pursue them before the district court. A claim for relief not pursued below is forfeited on appeal. *See Swanigan v. FCA US LLC*, 938 F.3d 779, 786 (6th Cir. 2019).

In their complaint, the captains asserted six Counts for relief. Count III sought relief for "violations of due process ensured under the Fourteenth Amendment to the Constitution of the United States, Civil Rights Act of 1871, 42 U.S.C. § 1983." R.1 at 15. Neither Count III's header nor the underlying analysis mentioned the Equal Protection Clause.

In response to the complaint, the city moved for a more definite statement, asking for clarification about whether the captains sought relief for a violation of the Due Process Clause or the Equal Protection Clause or both. Opposing the motion, the captains asserted that Count III of the complaint "put the Defendants on notice that an allegation of a violation of due process has been set forth." R.5 at 5. At that point, the court denied the city's motion for a more definite statement, reasoning that the captains had sufficiently pleaded the "legal theory of Count Three (Due Process Violations)." R.7 at 3. After that, the captains never amended their complaint to set the record straight. *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005). Because the claimants failed to present an equal protection argument below, they forfeited any such claims on appeal. *See Vance v. Wade*, 546 F.3d 774, 781 (6th Cir. 2008).

We reverse the district court's resolution of the discrimination claims under Title VII and Ohio law. We affirm the district court's resolution of the other claims.