# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 18, 2023

Lyle W. Cayce
Clerk

No. 21-10133

Felesia Hamilton; Tashara Caldwell; Brenda Johnson; Arrisha Knight; Jamesina Robinson; Debbie Stoxstell; Felicia Smith; Tameka Anderson-Jackson; Tammy Island,

*Plaintiffs—Appellants*,

*versus*

Dallas County, *doing business as Dallas County Sheriff's Department*,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:20-CV-313

_____

Before Richman, *Chief Judge*, and Higginbotham, Jones, Smith, Stewart, Elrod, Southwick, Haynes, Graves, Higginson, Willett, Ho, Duncan, Engelhardt, Oldham, Wilson, and Douglas, *Circuit Judges*.

Don R. Willett, *Circuit Judge*, joined by Richman, *Chief Judge*, and Higginbotham, Stewart, Elrod, Southwick, Haynes, Graves, Higginson, Ho, Duncan, Engelhardt, Wilson, and Douglas, *Circuit Judges*:

For almost 60 years, Title VII has made it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to

No. 21-10133

discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[1] Despite this broad language, we have long limited the universe of actionable adverse employment actions to so-called "ultimate employment decisions." We end that interpretive incongruity today.

*     *     *

The Dallas County Sheriff's Department gives its detention service officers two days off each week. The department uses a sex-based policy to determine which two days an officer can pick. Only men can select full weekends off—women cannot. Instead, female officers can pick either two weekdays off or one weekend day plus one weekday. Bottom line: Female officers never get a full weekend off.

Nine female detention service officers sued Dallas County, alleging that this sex-based scheduling policy violates Title VII's prohibition against sex discrimination. Constrained by our decades-old, atextual precedent, a panel upheld dismissal of the officers' complaint, ruling that the discriminatory scheduling policy did not amount to an "ultimate employment decision." But the panel noted that this case was the "ideal vehicle" for the en banc court to align our circuit with Title VII's text.

Today we hold that a plaintiff plausibly alleges a disparate-treatment claim under Title VII if she pleads discrimination in hiring, firing, compensation, or the "terms, conditions, or privileges" of her employment. She need not also show an "ultimate employment decision," a phrase that appears nowhere in the statute and that thwarts legitimate claims of

_____

[1] 42 U.S.C. § 2000e-2(a)(1).

workplace bias. Here, giving men full weekends off while denying the same to women—a scheduling policy that the County admits is sex-based—states a plausible claim of discrimination under Title VII.

We REVERSE and REMAND.

I

This case concerns a sex-based scheduling system for jail guards in the Dallas County Sheriff's Department.

The plaintiffs are nine female correctional officers who allege that their shift schedules used to be "determined based on seniority." Beginning in April 2019, however, the County adopted a sex-based scheduling policy under which "only male officers are given full weekends off." "Female employees are not given full weekends off and can only receive weekdays and/or partial weekends off." But weekend days are "preferred days off" for both men and women. As a result, schedules are sex-based even though "male and female employees perform the same tasks."[2]

After exhausting their administrative remedies, the Officers sued the County for sex discrimination under Title VII, 42 U.S.C. §§ 2000e *et seq.* The Officers also asserted a parallel state-law discrimination claim under the Texas Employment Discrimination Act, TEX. LAB. CODE §§ 21.001 *et seq.*

_____

[2] The Officers' supervisor explained that the rationale behind this policy is "that it would be unsafe for all the men to be off during the week and that it was safer for the men to be off on the weekends." However, "male and female employees perform the same tasks and the number of inmates during the week is the same as the number of inmates on the weekend." The County also states in its briefs that the policy was only "temporary," but this fact does not appear in the complaint.

No. 21-10133

The district court granted the County's motion to dismiss under Rule 12(b)(6), noting that, under our precedent, "an adverse employment action for Title VII discrimination claims consists of 'ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating.'"[3] Applying that precedent, the district court reasoned that "[c]hanges to an employee's work schedule, such as the denial of weekends off, are not an ultimate employment decision."[4] Because the adverse-employment-action element of the prima-facie Title VII case was missing, the district court dismissed the complaint.[5]

On initial appeal, a panel of our court affirmed, reasoning along the same lines. Noting that the County did "not dispute its discriminatory intent,"[6] the panel observed that "[t]he conduct complained of here fits squarely within the ambit of Title VII's proscribed conduct: discrimination with respect to the terms, conditions, or privileges of one's employment because of one's sex."[7] The panel added:

- "Given the generally accepted meaning of those terms, the County would appear to have violated Title VII."[8]

- "Surely allowing men to have full weekends off, but not women, on the basis of sex rather than a neutral factor like merit or seniority, constitutes discrimination with respect

---

[3] *Hamilton v. Dallas Cnty.*, 2020 WL 7047055, at *2 (N.D. Tex. Dec. 1, 2020) (quoting *Felton v. Polles*, 315 F.3d 470, 486 (5th Cir. 2002)).

[4] *Id.* (citing *Benningfield v. City of Houston*, 157 F.3d 369 (5th Cir. 1998)).

[5] *Id.* at *3.

[6] *Hamilton v. Dallas Cnty.*, 42 F.4th 550, 553 (5th Cir. 2022).

[7] *Id.* at 555.

[8] *Id.*

No. 21-10133

to the terms or conditions of those women's employment."[9]

- "[T]he benefits that come with seniority, here, the ability to request one's preferred days off, should amount to a privilege of employment."[10]

Even so, the panel concluded that it was "bound by this circuit's precedent, which requires a Title VII plaintiff" to have "suffered some adverse employment action by the employer" and which says that "adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating."[11] Because "the denial of weekends off is not an ultimate employment decision," the panel affirmed the district court's dismissal.[12] The panel concluded by urging the full court to "reexamine our ultimate-employment-decision requirement" in light of our deviation from Title VII's plain text.[13] We granted rehearing en banc to do so.

II

Our standard of review and the dismissal rules under Rule 12(b)(6) are well settled. "We review de novo the district court's dismissal for failure to

---

[9] *Id.*

[10] *Id.* (footnote omitted).

[11] *Id.* (cleaned up) (first quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); and then quoting *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 824 (5th Cir. 2019)).

[12] *Id.* at 556 (first citing *Hernandez v. Sikorsky Support Servs., Inc.*, 495 F. App'x 435, 438 (5th Cir. 2012) (per curiam) (unpublished); and then citing *Mylett v. City of Corpus Christi*, 97 F. App'x 473, 475 (5th Cir. 2004) (per curiam) (unpublished)).

[13] *Id.* at 557.

No. 21-10133

state a claim under Rule 12(b)(6)."[14] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[15] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[16]

## III

The facts alleged paint a clear picture of disparate treatment "because of" the Officers' "sex."[17] And the County does not dispute its discriminatory intent.[18] Therefore, the only issue before us is whether the Officers have plausibly alleged facts constituting an actionable adverse employment action under Title VII.

## A

We begin by considering whether Section 703(a) of Title VII,[19] the so-called anti-discrimination provision,[20] applies only to "ultimate employment decisions." It is not so limited.

---

[14] *Ghedi v. Mayorkas*, 16 F.4th 456, 463 (5th Cir. 2021).

[15] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[16] *Id.*

[17] 42 U.S.C. § 2000e-2(a)(1).

[18] *See Hamilton*, 42 F.4th at 553.

[19] 42 U.S.C. § 2000e-2(a).

[20] *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61 (2006).

No. 21-10133

"As with any question of statutory interpretation, our analysis begins with the plain language of the statute."[21] Section 703(a) states:

It shall be an unlawful employment practice for an employer—

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.[22]

Our focus today is on the first subsection.[23]

For decades, our precedent has limited disparate-treatment liability under Section 703(a)(1) to "ultimate employment decisions." By this phrase, we meant "'only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating.'"[24]

---

[21] *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009).

[22] 42 U.S.C. § 2000e-2(a).

[23] Although neighboring § 2000e-2(a)(2)'s prohibition is broader, making it unlawful "to limit, segregate, or classify . . . employees . . . in any way which would deprive or tend to deprive [them] of employment opportunities or otherwise adversely affect [their] status as . . . employee[s], because of . . . race" or "sex," this language forms the basis for disparate-*impact* claims, whereas disparate-*treatment* claims are properly brought under § 2000e-2(a)(1). *See Carpenter v. Stephen F. Austin State Univ.*, 706 F.2d 608, 619 n.7 (5th Cir. 1983).

[24] *Welsh*, 941 F.3d at 824 (quoting *McCoy*, 492 F.3d at 559); *see also Alvarado v. Tex. Rangers*, 492 F.3d 605, 612 (5th Cir. 2007); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004); *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014) ("For Title

7

No. 21-10133

We first used that phrase almost 30 years ago in *Dollis v. Rubin*, which declared that "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions."[25] But the only authority *Dollis* cited for this proposition was *Page v. Bolger*, a 1981 case (and the origin of the phrase "ultimate employment decision") in which the Fourth Circuit observed that then-extant Title VII caselaw had "focused on the question whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating."[26] Ironically, the Fourth Circuit in *Page* then qualified this comment, writing, "[W]e suggest no general test for defining those 'ultimate employment decisions' . . . covered by . . . antidiscrimination provisions of Title VII. . . . [T]here are certainly [decisions] other[] than those we have so far specifically identified that may be so considered for example, entry into training programs."[27] Thus, *Dollis*'s embrace of an "ultimate employment decision" rule was based on a misinterpretation of *Page*, which used that phrase merely to describe trends

---

VII and § 1981 discrimination claims, we have held that adverse employment actions consist of 'ultimate employment decisions' such as hiring, firing, demoting, promoting, granting leave, and compensating.").

[25] 77 F.3d 777, 781–82 (5th Cir. 1995) (per curiam). Although *Dollis* involved a claim not of discrimination in violation of 42 U.S.C. § 2000e-2(a), but of retaliation for engaging in Title VII-protected activity in violation of § 2000e-3(a), *Dollis* did not limit its holding to retaliation claims, and our subsequent decisions applied *Dollis*'s "ultimate employment decision" requirement in disparate-treatment cases as well. *See Felton*, 315 F.3d at 486.

[26] 645 F.2d 227, 233 (4th Cir. 1981) (en banc).

[27] *Id.*

in Title VII litigation, not to restrict Title VII's broad coverage to a handful of examples of discrimination mentioned in the *Page* opinion.[28]

Bound by this standard, we have reached some remarkable conclusions. Consider *Peterson v. Linear Controls, Inc.*, where the plaintiff "alleged that he and his black team members had to work outside without access to water, while his white team members worked inside with air conditioning."[29] Noting that "[o]ur court strictly construes adverse employment actions to include only 'ultimate employment decisions,' such as 'hiring, granting leave, discharging, promoting, or compensating,'" we held "that these working conditions [were] not adverse employment actions because they [did] not concern ultimate employment decisions."[30]

But that's not what the statute says—at all.[31] Nowhere does Title VII say, explicitly or implicitly, that employment discrimination is lawful if limited to non-ultimate employment decisions. To be sure, the statute prohibits discrimination in ultimate employment decisions—"hir[ing]," "refus[ing] to hire," "discharg[ing]," and "compensation"—*but it also* makes it unlawful for an employer "otherwise to discriminate against" an

---

[28] The Fourth Circuit itself has also disapproved of our interpretation of *Page*. *See Von Gunten v. Maryland*, 243 F.3d 858, 866 n.3 (4th Cir. 2001).

[29] 757 F. App'x 370, 373 (5th Cir. 2019) (per curiam), *cert. dismissed*, 140 S. Ct. 2841 (2020).

[30] *Id.* at 373 (quoting *McCoy*, 492 F.3d at 559).

[31] *See Hardison v. Skinner*, No. 20-30643, 2022 WL 2668514, at *6 (5th Cir. July 11, 2022) (Dennis, J., specially concurring) (noting that the ultimate-employment-decision standard is a "judge-crafted limitation" with "no basis in the plain text or legislative history of Title VII").

employee "with respect to [her] terms, conditions, or privileges of employment." [32]

Our ultimate-employment-decision test ignores this key language. But "[t]hese words cannot be meaningless, else they would not have been used." [33] Restricting liability under the statute to "'ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating'" [34] renders the statute's catchall provision all but superfluous. This we cannot do. [35] "Absent persuasive indications to the contrary, we presume Congress says what it means and means what it says." [36] And here, Congress did not say that Title VII liability is limited to ultimate employment decisions.

Supreme Court precedent confirms this conclusion. The Court has held that an adverse employment action "need only be a term, condition, or privilege of employment." [37] And it has been clear that a Title VII plaintiff may recover damages even for "discrimination in the 'terms, conditions, or privileges of employment'" that "did not involve a discharge," "loss of pay," or other "concrete effect on [his or her] employment status." [38] Nor is

_____

[32] 42 U.S.C. § 2000e-2(a)(1).

[33] *United States v. Butler*, 297 U.S. 1, 65 (1936).

[34] *Welsh*, 941 F.3d at 824 (quoting *McCoy*, 492 F.3d at 559).

[35] *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute." (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)) (internal quotation marks omitted)).

[36] *Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016).

[37] *Hishon v. King & Spalding*, 467 U.S. 69, 77 (1984).

[38] *Landgraf v. USI Film Prod.*, 511 U.S. 244, 254 (1994) (quoting 42 U.S.C. § 2000e-2(a)(1)).

Title VII's coverage "limited to 'economic' or 'tangible' discrimination."[39] This is because Section 703(a)(1) "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment.'"[40] Any "benefits that comprise the incidents of employment, or that form an aspect of the relationship between the employer and employees," the Court has explained, fall within Title VII's ban on discrimination.[41]

It is no wonder, then, that "[n]o other court of appeals applies so narrow a concept of an adverse employment action" as the "'ultimate employment decision' rule."[42] Satisfied that our "ultimate employment decision" standard lies on fatally flawed foundations, we flatten it today. Having done away with our atextual "ultimate employment decision" gloss, we apply the statute as it is written and as construed by the Supreme Court.

B

It should go without saying by now, but "we think it reasonable to begin with Title VII's text."[43] Under Title VII, it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because

---

[39] *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).

[40] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Meritor*, 477 U.S. at 64).

[41] *Hishon*, 467 U.S. at 75 (cleaned up) (first quoting S. REP. NO. 867, 88th Cong., 2d Sess., 11 (1964)); and then quoting *Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 178 (1971)).

[42] *Hardison*, 2022 WL 1136038, at *6 (Dennis, J., specially concurring).

[43] *Groff v. DeJoy*, 143 S. Ct. 2279, 2294 (2023).

No. 21-10133

of such individual's race, color, religion, sex, or national origin."[44] This language contains two elements. To plead a disparate-treatment claim under Title VII, a plaintiff must allege facts plausibly showing "(1) an 'adverse employment action,' (2) taken against a plaintiff 'because of her protected status.'"[45]

At issue in this case is the first element: whether the Officers have adequately shown an "adverse employment action" for Title VII purposes. That term, which appears nowhere in the statute, is "a judicially-coined term utilized as shorthand for the statutory phrase 'compensation, terms, conditions, or privileges of employment.'"[46] Thus, to plead an adverse employment action, a plaintiff need only allege facts plausibly showing discrimination in hiring, firing, compensation, or in the "terms, conditions,

---

[44] 42 U.S.C. § 2000e-2(a)(1). The Texas Employment Discrimination Act uses similar language, stating that an employer commits an unlawful employment practice if it "fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment." Tex. Lab. Code § 21.051(1).

[45] *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019) (citation omitted) (emphasis omitted).

At the pleading stage, a plaintiff need not plead a prima facie case under the *McDonnell Douglas* framework, 411 U.S. 792 (1973), though it is sometimes helpful to frame the analysis that way to determine whether a plaintiff has been discriminated against *because of* a protected characteristic. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002); *Olivarez v. T-Mobile USA, Inc.*, 997 F.3d 595, 600 (5th Cir. 2021); *cf. Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) ("For its part, *McDonnell Douglas* sought only to supply a tool for assessing claims, typically at summary judgment, when the plaintiff relies on indirect proof of discrimination.").

[46] *Thompson*, 764 F.3d at 508 (Smith, J., dissenting) (quoting 42 U.S.C. § 2000e-2(a)(1)); *Stone v. La. Dep't of Revenue*, 590 F. App'x 332, 339 (5th Cir. 2014) (per curiam) ("We use the shorthand term 'adverse employment action' to refer to an employment decision that negatively affects the compensation, terms, conditions, or privileges of employment.").

No. 21-10133

or privileges" of his or her employment.[47] Here, of course, the Officers allege discrimination in the catchall category: the "terms, conditions, or privileges of employment."[48]

Before applying the law to the Officers' allegations, we are mindful that the statutory phrase, "terms, conditions, or privileges of employment," is broad. As the Supreme Court has repeatedly stated, this language, while contractual in nature, "is not limited to 'economic' or 'tangible' discrimination," and "it covers more than 'terms' and 'conditions' in the narrow contractual sense."[49] Indeed, the Court has held that even a discriminatory and hostile work environment—when sufficiently severe or pervasive—can rise to the level of altering the terms, conditions, or privileges of employment for Title VII purposes.[50] The Officers have not brought a hostile-work-environment claim, of course, but the Court's elucidation of the statutory text in that context nonetheless informs our construction of the very same text for purposes of disparate-treatment claims.

Turning to the Officers' claims, we have little difficulty concluding that they have plausibly alleged discrimination "with respect to [their] . . . terms, conditions, or privileges of employment."[51] The days and hours that

_____

[47] 42 U.S.C. § 2000e-2(a)(1); *Hishon*, 467 U.S. at 77 (noting that the challenged employment action "need only be a term, condition, or privilege of employment").

[48] The Texas statute uses materially identical language. *See* TEX. LAB. CODE § 21.051(1) ("terms, conditions, or privileges of employment").

[49] *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (internal quotation marks omitted) (first quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); and then quoting *Oncale*, 523 U.S. at 78).

[50] *Harris*, 510 U.S. at 21–22; *Meritor*, 477 U.S. at 63–67.

[51] 42 U.S.C. § 2000e-2(a)(1).

one works are quintessential "terms or conditions" of one's employment.[52] Indeed, these details go to the very heart of the work-for-pay arrangement. Additionally, the complaint's allegations support a plausible inference that the right to pick work shifts based on seniority is a "privilege" of employment with the County. And "[a] benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion."[53] Here, by switching from a seniority-based scheduling system to one based on sex, the County plausibly denied the Officers the "privilege" of seniority because of their sex.

The Sixth Circuit recently reached the same conclusion in a strikingly similar case. In *Threat v. City of Cleveland*, the plaintiffs alleged that their employer had assigned night and day shifts based on race, even though the employer had previously used a seniority-based scheduling system.[54] Noting that it was a rather "straightforward" application of the English language, the Sixth Circuit held that "[a] shift schedule is a term of employment."[55] It further held that "[b]enefits that come with seniority may count as privileges of employment. And losing out on a preferred shift may diminish benefits that a senior employee has earned."[56] "It's not even clear that we need dictionaries to confirm what fluent speakers of English know."[57] We agree with that court's reasoning. Here, as in *Threat*, switching from a seniority-

---

[52] *See Hishon*, 467 U.S. at 75–76 & 76 n.8 (noting that "wages" and "hours" come within the statutory phrase, "terms and conditions of employment," under a directly analogous statute (citing *Allied Chem. & Alkali Workers*, 404 U.S. 157)).

[53] *Id.* at 75.

[54] 6 F.4th 672, 676 (6th Cir. 2021).

[55] *Id.* at 677 ("How could the *when* of employment not be a *term* of employment?").

[56] *Id.*

[57] *Id.*

based system to a sex-based system discriminates against employees in the "terms, conditions, or privileges of employment."[58] It's that simple. At the pleading stage, these allegations are sufficient to state a claim under Title VII.

The County's contrary position is that "a shift change, without more, is not an adverse employment action." The County says that we should ignore Title VII's text by limiting liability for disparate treatment to cases in which the employer's actions "directly cause, or are likely to cause in the future, loss of or reduced employment compensation." Such a standard, they contend, is objective, judicially administrable, and necessary to hold back what (they say) would otherwise be a flood of Title VII litigation over run-of-the-mill workplace squabbles.

But even putting aside the fact that Title VII's text, on its face, is not limited to economically adverse employment actions, we cannot construe the statute in this manner. For one, the Supreme Court has repeatedly stated that Section 703(a)'s text "is not limited to 'economic' or 'tangible' discrimination."[59] For another, to limit Title VII liability to cases in which the employer's discrimination impacted an employee's compensation would render superfluous the key phrase "terms, conditions, or privileges," as the very same section *already* prohibits discrimination "with respect to [an employee's] compensation."[60] Clearly, then, such a crabbed reading of the statute cannot be right.[61]

As a fallback position, the County suggests that we should require a plaintiff to show—in addition to discrimination with respect to the "terms,

_____

[58] 42 U.S.C. § 2000e-2(a)(1).

[59] *Faragher*, 524 U.S. at 786 (quoting *Harris*, 510 U.S. at 21).

[60] 42 U.S.C. § 2000e-2(a)(1).

[61] *See Duncan*, 533 U.S. at 174.

conditions, or privileges of employment"—a "materially adverse employment action," a "tangible employment action," or an "objective material harm requirement." At the very least, it contends, Title VII liability does not extend to "de minimis" discrimination. Indeed, most of the County's briefing is devoted to rebutting the Officers' position, which is that Title VII "establishes no minimum level of actionable harm." There is some merit to the County's position, as nearly every circuit court seems to have adopted one of these limitations.[62] And we readily acknowledge that the Supreme Court has cautioned federal courts not to "transform Title VII into a general civility code for the American workplace."[63] Title VII accordingly does not permit liability for de minimis workplace trifles.[64]

---

[62] *See, e.g.*, *Morales-Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010) ("materially adverse change in the terms and conditions of employment"); *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) ("materially adverse"); *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) ("serious and tangible enough" (internal quotation marks and citation omitted)); *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004) ("significant detrimental effect" (internal quotation marks and citation omitted)); *McCoy*, 492 F.3d at 559 (5th Cir. 2007) ("ultimate employment decisions"); *Threat*, 6 F.4th at 679 (6th Cir. 2021) (excluding "de minimis" employment actions); *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002) ("materially adverse employment action" (internal quotation marks omitted)); *Cooney v. Union Pac. R.R. Co.*, 258 F.3d 731, 734 (8th Cir. 2001) ("tangible change in working conditions that produces a material employment disadvantage" (internal quotation marks and citation omitted)); *Chuang v. Univ. of California Davis, Bd. of Trs.*, 225 F.3d 1115, 1126 (9th Cir. 2000) ("materially affect the compensation, terms, conditions, or privileges of . . . employment"); *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) ("significant change in employment status" (internal quotation marks and citation omitted)); *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) ("serious and material," "tangible adverse effect on the plaintiff's employment" (emphasis omitted)); *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999) ("objectively tangible harm"), *overruled by Chambers v. District of Columbia*, 35 F.4th 870, 882 (D.C. Cir. 2021) (en banc).

[63] *Oncale*, 523 U.S. at 80.

[64] *Threat*, 6 F.4th at 678 ("[O]ur approach honors a de minimis exception that forms the backdrop of all laws."); *Chambers*, 35 F.4th at 883 (Walker, J., concurring in the

No. 21-10133

But whatever standard we might apply, it is eminently clear that the Officers' allegations would satisfy it at the pleading stage. In light of the allegation that full weekends off is a preferred shift for both men and women, it is plausible that requiring female officers to work weekends but not male officers is a "tangible," "objective," and "material" instance of sex discrimination in the terms, conditions, or privileges of employment—and far more than "de minimis."[65] So, too, is denying seniority privileges to female officers while allowing male officers to exercise theirs. We thus leave for another day the precise level of minimum workplace harm a plaintiff must

---

judgment in part and dissenting in part) ("[N]othing indicates that Congress intended to displace the de minimis principle in Title VII's antidiscrimination provision."); *id.* at 890 (Katsas, J., dissenting) ("As the Supreme Court has explained, the venerable maxim *de minimis non curat lex* ('the law cares not for trifles') is part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept. Nothing in Title VII abrogates this background principle." (internal quotation marks and citation omitted)); *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 660 (7th Cir. 2005) ("Courts have resisted the idea that federal law regulates matters of attitude or other small affairs of daily life" in large part "because of the maxim *de minimis non curat lex*[.]").

While the circuit courts vary in how they articulate their preferred materiality standard, *see supra* note 62, all circuits agree that, at the very least, Title VII does not permit liability for petty trivialities or insubstantial annoyances. Future cases in our circuit will need to determine the floor that Title VII's anti-discrimination provision sets for actionable harm. But that question—whether "material" and "more than de minimis" are simply two sides of the same coin, or whether there is more room between those terms—is a question for another day. *Cf. Groff*, 143 S. Ct. at 2294 ("We hold that showing 'more than a *de minimis* cost,' as that phrase is used in common parlance, does not suffice to establish 'undue hardship' under Title VII."); *Threat*, 6 F.4th at 679 ("But de minimis means de minimis, and shorthand characterizations of laws should not stray."). Nothing in this opinion or in our sister-circuit citations should be read to foreshadow our opinion on what measure of materiality is required. And dicta on a question not answered here should not be passed from opinion to opinion, lest the message be mangled as if in "the children's game of telephone." *Id.* (internal quotation marks omitted).

[65] *See Groff*, 143 S. Ct. at 2295 (noting that "de minimis" means "something that is 'very small or trifling'" (quoting BLACK'S LAW DICTIONARY 388 (5th ed. 1979))).

17

No. 21-10133

allege on top of showing discrimination in one's "terms, conditions, or privileges of employment."[66]

## IV

To adequately plead an adverse employment action, plaintiffs need not allege discrimination with respect to an "ultimate employment decision." Instead, a plaintiff need only show that she was discriminated against, because of a protected characteristic, with respect to hiring, firing, compensation, or the "terms, conditions, or privileges of employment"— just as the statute says.[67] The Officers here have done so.

For these reasons, we REVERSE the district court's judgment and REMAND for further proceedings consistent with this opinion.[68]

---

[66] 42 U.S.C. § 2000e-2(a)(1). Further counseling against our wading into this issue is that the Supreme Court appears poised to address it, as the Court recently granted certiorari in *Muldrow v. City of St. Louis*, 30 F.4th 680 (8th Cir. 2022), *cert. granted in part*, 143 S. Ct. 2686, 2023 WL 4278441 (U.S. June 30, 2023) (No. 22-193).

[67] 42 U.S.C. § 2000e-2(a)(1); Tex. Lab. Code § 21.051(1).

[68] The parties did not separately discuss the Officers' state-law claim and agree that the state-law claim should be treated the same as the federal Title VII claim. For the sake of clarity, because we vacate and remand the Title VII claim, we REVERSE and REMAND the state-law claim for further proceedings as well.

No. 21-10133

James C. Ho, *Circuit Judge*, concurring:

Our longstanding circuit precedent limits employment discrimination claims under Title VII of the Civil Rights Act of 1964 to only those employer actions that constitute "ultimate employment decisions," such as "hiring, granting leave, discharging, promoting, and compensating." *Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir. 1995).

But that's not what the text says.  Title VII sweeps more broadly.  It prohibits discrimination not only in hiring, firing, and compensation, but also with respect to the "terms, conditions, or privileges of employment."  42 U.S.C. § 2000e–2(a)(1).

So the majority today overturns circuit precedent and restores the text.  I concur.

I write separately to respond to our distinguished colleagues who concur only in the judgment.  Our colleagues criticize the majority for overturning precedent while "refus[ing]" to answer certain questions. *Post*, at 26.  They say that "leaving [those unanswered questions] for another day" may even offend "[o]rdinary concepts of due process." *Id.* at 26–27.

* * *

When longstanding precedent conflicts with plain text, we have to decide what's more important:  Restoring the text?  Or resolving every unanswered question that restoring the text might present, before we do so?

It's a choice we must make, because overturning atextual precedent can raise a number of unanswered questions.  But the existence of unanswered questions should not stop us from restoring text and overturning precedent.  Rather, we should "decide every case faithful to the text . . . to the maximum extent permitted by a faithful reading of binding precedent."

19

*Texas v. Rettig*, 993 F.3d 408, 409 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc).

Justice Thomas has written that, "[w]hen faced with a demonstrably erroneous precedent, my rule is simple: We should not follow it." *Gamble v. United States*, 139 S. Ct. 1960, 1984 (2019) (Thomas, J., concurring). And that's why we granted rehearing en banc in this case—because only the en banc court has the authority to overturn erroneous circuit precedent.

## I.

This debate reminds me of the dueling opinions over unanswered questions in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021). Members of the Court there sharply disagreed over whether to restore the text of the Free Exercise Clause of the First Amendment by overturning *Employment Division v. Smith*, 494 U.S. 872 (1990).

Justice Barrett acknowledged that the arguments against *Smith* are "compelling." 141 S. Ct. at 1882 (Barrett, J., concurring). "As a matter of text and structure, it is difficult to see why the Free Exercise Clause—lone among the First Amendment freedoms—offers nothing more than protection from discrimination." *Id.*

But she declined to overturn *Smith* because she was concerned about the unanswered questions that overturning *Smith* would raise. "Yet what should replace *Smith*?" *Id.* "There would be a number of issues to work through if *Smith* were overruled." *Id.* at 1883. She set forth a series of questions that the Court would inevitably have to "wrestle with" in future cases if *Smith* were overturned. *Id.* (collecting unanswered questions).

Justice Gorsuch responded to Justice Barrett's concerns about unanswered questions. He noted that "not a single Justice has lifted a pen to

No. 21-10133

defend the decision" in *Smith*. *Id.* at 1931 (Gorsuch, J., concurring in the judgment). "So what are we waiting for?" *Id.*

"We hardly need to 'wrestle' today with every conceivable question that might follow from recognizing *Smith* was wrong." *Id.* "To be sure, any time this Court turns from misguided precedent back toward the Constitution's original public meaning, challenging questions may arise across a large field of cases and controversies. But that's no excuse for refusing to apply the original public meaning in the dispute actually before us." *Id.* "Rather than adhere to *Smith* until we settle on some 'grand unified theory' of the Free Exercise Clause for all future cases until the end of time, the Court should overrule it now, set us back on the correct course, and address each case as it comes." *Id.* (citation omitted).

## II.

Fidelity to text will sometimes require overturning atextual precedent. And overturning atextual precedent will sometimes result in unanswered questions that courts may need to address in future cases. But that's what courts are for. It's not a reason to ignore text.

Just look at how the Supreme Court ruled in its two most recent decisions involving the 1964 Civil Rights Act, decided on the same day at the close of its most recent Term.

In *Groff v. DeJoy*, _ U.S. _ (2023), and *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, _ U.S. _ (2023), the Court favored text over longstanding atextual precedent. And it did so knowing full well that both decisions leave unanswered a whole range of questions that courts will now have to confront in future cases.

No. 21-10133

## A.

Let's start with *Groff.* Title VII not only forbids employers from discriminating against people of faith—it affirmatively requires employers to accommodate their religious practices, unless doing so would impose an "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Decades ago, however, the Court concluded that requiring an employer to "bear more than a de minimis cost . . . is an undue hardship." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977).

In *Groff*, the Court did away with the "de minimis" gloss in *Hardison*—much like how our circuit today does away with our "ultimate employment decision" gloss in *Dollis*.

Notably, the Court abandoned the "de minimis" standard even though that will inevitably lead to a number of unanswered questions. After all, if we're no longer following the de minimis standard, then courts will now have to decide how much hardship is "undue" for the employer's business— a question that will have to be resolved in virtually every case imaginable involving a request for a religious accommodation. *See*, *e.g.*, George Weykamp, *Religious Objections Over Pronouns Test High Court's New Stance*, Bloomberg, Aug. 9, 2023.

The Court was well aware of this and restored the text anyway. In fact, it acknowledged that unanswered questions will be presented, not only in other cases in the wake of *Groff*, but in *Groff* itself: "Having clarified the Title VII undue-hardship standard, we think it appropriate to leave the context-specific application of that clarified standard to the lower courts in the first instance. . . . [W]e think it appropriate to leave it to the lower courts to apply our clarified context-specific standard, and to decide whether any further factual development is needed." _ U.S. at _.

No. 21-10133

Justice Gorsuch summed it up this way during oral argument:  It would be "a good day's work" "simply to say" that "this de minimis language" is "not the law," "put a period at the end of it," and leave future questions for future cases.  Tr. of Oral Arg. 64–65.

**B.**

The same is true in *Students for Fair Admissions*.  Title VI states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  For decades, however, the Supreme Court has allowed colleges and universities to consider race in deciding which students to admit—and which students to deny.  *See*, *e.g.*, *Grutter v. Bollinger*, 539 U.S. 306 (2003).

In *Students for Fair Admissions*, the Court restored the plain text of Title VI and prohibited colleges and universities from discriminating on the basis of race.

Once again, the Court restored text despite the heated debates over alternative admissions policies that would predicably erupt as a result.

For example, university leaders have already suggested that they may use admissions essays to achieve the preferred racial outcomes they previously attained through race-conscious admissions.  *See*, *e.g.*, Steven McGuire, *Can Harvard Use Application Essays to Discriminate by Race?*, WALL ST. J., Aug. 11, 2023.  The validity of such efforts will require courts to answer a number of legal questions.  To take just one:  University leaders justify these efforts by claiming an interest in diversity.  So courts will have to decide whether that interest is sincere or pretextual, in light of other dynamics such as ideological conformity on campus, homogeneity in faculty and administration hiring, and student disruptions of disfavored viewpoints.

Courts will have to decide whether schools can justify their DEI efforts if their vision of diversity doesn't include diverse viewpoints, if equity doesn't encompass equality for people of faith, and if inclusion involves excluding politically unpopular beliefs.  For schools that tolerate (if not practice) ideological discrimination, courts will have to determine whether diversity is nothing more than a pretext for race.

Yet none of this stopped the Court from restoring the plain text of Title VI in *Students for Fair Admissions*.

And so too here.  Our beloved colleagues are no doubt correct that our majority opinion today will lead to unanswered questions and future cases.  But that is no reason to favor atextual precedent over text, just as it wasn't in *Groff* and in *Students for Fair Admissions*.

## III.

Congress enacted the Civil Rights Act of 1964 to protect every American against every form of prohibited discrimination—not just certain favored classes against certain disfavored forms of discrimination.  For decades, however, the judiciary has distorted the Act in various ways to protect some Americans, while excluding others.

Today's decision is just the latest in a series of recent rulings designed to restore the full meaning of the Civil Rights Act for the benefit of all Americans.  *Groff* restores Title VII for people of faith.  *Students for Fair Admissions* restores Title VI for Asian American students.  And our decision today will help restore federal civil rights protections for anyone harmed by divisive workplace policies that allocate professional opportunities to employees based on their sex or skin color, under the guise of furthering diversity, equity, and inclusion.

No. 21-10133

As the Civil Rights Division of the Justice Department noted during en banc oral argument in this case, if "a law firm is having a lunch to do CLEs and you have a policy that says we're only going to invite women but not men to this CLE lunch, that's of course actionable, and that's of course a term, condition, or privilege of employment" under Title VII. Audio of Oral Arg. 23:00–23:29. The Justice Department agreed that "a lot of law firms do that." *Id.* at 25:35. It also noted that "work assignments . . . happening on the basis of race" are likewise actionable under Title VII. *Id.* at 27:12–20.

The Justice Department is not alone in expressing these concerns. *See*, *e.g.*, Andrea R. Lucas, *With Supreme Court affirmative action ruling, it's time for companies to take a hard look at their corporate diversity programs*, REUTERS, June 29, 2023 ("Title VII bars . . . a host of increasingly popular race-conscious corporate initiatives: from providing race-restricted access to mentoring, sponsorship, or training programs; to selecting interviewees partially due to diverse candidate slate policies; to tying executive or employee compensation to the company achieving certain demographic targets; to offering race-restricted diversity internship programs or accelerated interview processes, sometimes paired with euphemistic diversity 'scholarships' that effectively provide more compensation for 'diverse' summer interns."); U.S. Senator Tom Cotton, *Cotton Warns Top Law Firms About Race-Based Hiring Practices*, July 17, 2023.

* * *

"Equality of opportunity is fundamental to who we are, and to who we aspire to be, as a nation." *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 464 (5th Cir. 2021). Today's decision will help bring us closer to achieving those aspirations. I concur.

No. 21-10133

Edith H. Jones, *Circuit Judge*, joined by Smith and Oldham, *Circuit Judges*, concurring in the judgment only:

I concur in the result reached by the majority, a remand for further development in this decidedly unusual case. After all, the plaintiffs' pleading is that the Dallas County Sheriff's Department changed the weekend shift pattern from seniority-based to specifically gender-based, to the alleged detriment of the female staff. Rarely in recent years have we seen such an admission. In my view, our governing precedents sufficed to countenance remand and further development. *See Thompson v. City of Waco*, 764 F.3d 500, 505-06 (5th Cir. 2014) (any employment decision causing such "significant and material" harm that it makes the employee's job "objectively worse" is ultimate because it is the "equivalent of a demotion"); *see also Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999). But this does not satisfy the present-minded majority, who decry and apparently annul our "atextual" thirty-year string of precedents.[69] The question left hanging by the majority is what kind of "term or condition" of employment creates an actionable Title VII discrimination claim. The majority refuses to say, leaving "for another day the precise level of minimum workplace harm a plaintiff must allege on top of showing discrimination in one's 'terms, conditions, or privileges of employment.'"

The majority's incomplete ruling fails for two reasons. First, it leaves the bench, bar, and employers and employees with no clue as to what this court will finally declare to be the minimum standard for Title VII liability. The majority holding amounts to this: we hold that speeding is illegal, but we will not say now what speed is illegal under what

_____

[69] As the majority catalogues in its Footnote 62, nearly every circuit has similar, long-standing precedent imposing minimum standards for liability under Title VII.

circumstances. Ordinary concepts of due process should have required notice to the public regarding this vital and pervasive workplace law. The omission is doubly troubling, because even as this court dithers, the Supreme Court is poised to resolve the circuit split in a case not dissimilar from this one. *See Muldrow v. City of St. Louis Missouri*, No. 22-193, 2023 WL 4278441, at *1 (U.S. June 30, 2023) (cert. granted to decide if Title VII prohibits "discrimination in transfer decisions absent a separate court determination that the transfer decision caused a significant disadvantage").[70] If panels of this court begin to populate the new "textual" Title VII holding with caselaw about materiality or de minimis discrimination, they are all subject to revision no later than June 2024, and this circuit will be back in a position of uncertainty, pending even further developments. This is not judicial prudence, it is judicial abdication. Prudence would have counselled that we continue to enforce our governing precedents until they are refined by the Supreme Court.

Second, I disagree with the majority's claim to a "textual" reading of Title VII that purports to eschew materiality as a necessary basis of employer liability. Since what we write today is eminently and imminently contingent, this will be brief. In the most recent case to thoroughly explore the statutory basis for Title VII employment discrimination cases, Judge Katsas's dissent offered a wholly convincing "textualist" explanation as to why actionable

---

[70] In that case, the plaintiff alleged that she had been transferred from one division of the St. Louis Police Department to another. The court declined to find a Title VII violation, reasoning that her new position "did not result in a diminution to her title, salary, or benefits" or result in "a significant change in working conditions or responsibilities." *Muldrow v. City of St. Louis Missouri*, 30 F.4th 680, 688-89 (8th Cir. 2022). Because "a mere preference for one position over the other" was insufficient to meet the circuit's "adverse employment action" standard, the Eighth Circuit affirmed a grant of summary judgment to the city. *Id.* at 689. To decide *Muldrow*, therefore, the Supreme Court must say something about what kind of injury suffices to support a Title VII claim.

discrimination must entail a "materially adverse" change in work conditions when viewed "objectively" by a reasonable observer. *Chambers v. D.C.*, 35 F.4th 870, 886 (D.C. Cir. 2022) (Katsas, J., dissenting).[71] First, Section 703(a)(1)'s use of the phrase "discriminate against" means that the plaintiff must have suffered an injury of some kind.[72] *Id.* at 889-90. Second, the law's general background presumption against recovery for de minimis injuries is not abrogated here. *Id.* at 890. Third, by the canon of ejusdem generis, the types of discrimination specifically enumerated in Section 703—"to fail or refuse to hire or to discharge any individual"—make clear that the actions covered by Section 703's more general clause—"or otherwise to discriminate"—must constitute objectively material harm. *Id.*

Further support for Judge Katsas's interpretation springs from the fact that other claims actionable under Title VII, such as hostile work environment, retaliation, and constructive discharge claims, all require threshold standards connoting objective, material injury. A sexual harassment claim is not actionable unless the misconduct is "severe or pervasive enough to create an objectively hostile or abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993). "To show constructive discharge, an employee must offer evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign." *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994). Most recently, the Supreme Court embraced an interpretation of Title VII retaliation in

---

[71] This court's majority, curiously, fails to mention the erudite clash of views espoused on these questions in the D.C. Circuit's debate.

[72] *See also Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1740 (2020) ("To discriminate against a person . . . would seem to mean treating that individual worse than others who are similarly situated.") (quotation marks omitted).

No. 21-10133

Section 704(a), 42 U.S.C. § 2000e-3(a), that includes conduct outside the workplace. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63, 126 S. Ct. 2405, 2412 (2006). But at the same time, the Court emphasized that an objective standard is required because the term "discriminate against" in Section 704(a) protects "an individual, not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67, 2414. Further, "the provision's standard for judging harm must be objective." *Id.* at 68, 2415. The Supreme Court's interpretation of "discriminate against" in this companion antiretaliation provision must, under the presumption of consistent usage[73] apply to the same language in Section 703(a)(1). *Chambers*, 35 F.4th at 891–92. This point of textualism the majority also overlooked.

Finally, as the majority recognizes, the Supreme Court emphasizes that Title VII does not effectuate a workplace "general civility code." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 1002 (1998). Yet as written, the majority opinion has no baseline for "discrimination" based on terms or conditions of employment.[74] Take one example. In a hypothetical workplace, only one supervisor is permitted to work remotely from out-of-state because of a spouse's relocation. If that supervisor is male, or white, or Christian, does this mean that any female, black, or Muslim supervisor is "discriminated against" if denied the same

---

[73] *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 171–73 (2012).

[74] To be sure, the majority dance around holding that de minimis injuries are not actionable, and it refuses to state whether a materiality standard may be invoked in subsequent cases. Technically, of course, neither adumbration to Section 703(a)(1) is "textual" in the majority's literalistic sense. Moreover, as Judge Katsas explained, even while the majority's decision (in *Chambers* as in this case) claims to be fact-specific, and "reserves the possibility that Title VII may not extend to *de minimis* injuries," "the decision cannot be fairly confined…." 35 F.4th at 887.

No. 21-10133

remote work opportunity? Another example: employer allows extended lunch period when a male employee says he's going to barbershop, but denies the request for a female. Are these cases actionable next week under the majority's reasoning?

Let us see what the Supreme Court does with *Muldrow* before we render any workplace "difference" an equivalent, for filing suit at least, of "discrimination."

I concur in the judgment only.