# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 9, 2024

Lyle W. Cayce
Clerk

————————

No. 22-40813

————————

Rosandra Daywalker,

*Plaintiff—Appellant*,

*versus*

UTMB at Galveston; MD Ben Raimer, *In His Official Capacity*,

*Defendants—Appellees*.

———————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:20-CV-99

———————————————————

Before Richman, *Chief Judge*, Stewart, *Circuit Judge*, and Scholer, *District Judge*.[†]

Per Curiam:[*]

Rosandra Daywalker appeals the district court's discovery decisions, denial of her motion for sanctions, grant of summary judgment, and dismissal of her Title VII, Rehabilitation Act, and Family and Medical Leave Act

———————————————

[†] United States District Judge for the Northern District of Texas, sitting by designation.

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-40813

("FMLA") discrimination claims against her former employer. Because we find no error, we AFFIRM.

## I. Factual Background

In June 2015, Daywalker, a Black woman, graduated with honors from her medical school and matched to the five-year Otolaryngology residency program at the University of Texas Medical Branch at Galveston ("UTMB"). In a residency program, medical school graduates pursue advanced certifications in specialized fields of medicine while training under the supervision of a faculty of experienced doctors. Otolaryngology is the medical specialty involving the surgical and medical management of head and neck conditions. Daywalker was the only Black resident in UTMB's 2015–2020 Otolaryngology program class.

Otolaryngology residents at UTMB cycle through medical rotations in different specialty departments, attend lectures, and participate in didactic exercises. UTMB's program is structured so that a resident is provided with greater responsibilities and expected to exhibit core clinical competencies as they progress through their post-graduate years. A typical post-graduate year in the program begins in July and runs through the following June. To aid residents progressing through the program, UTMB's Clinical Competency Committee discusses residents' progress and development of core competencies. The Committee also imposes discipline and improvement plans, if necessary.

During her first two years at UTMB, Daywalker was supervised by Dr. Susan McCammon, a white woman. Within her first year in the program, she received good evaluations for her positive energy and "ability [to] communicate well with patients and families as well as nursing staff." However, some of her supervisors also reported that she had failed to timely complete medical documentation and had problems with unexcused

tardiness and absences in some clinical rotations. While Daywalker's clinical skills improved in her second year, some of her supervisors noted that she still needed to be more efficient in producing clinical documentation.

In April 2017, towards the end of Daywalker's second year, Dr. McCammon was replaced by Dr. Wasyl Szeremeta, a white man, as director of the program. In her end of second-year evaluations, Dr. Szeremeta noted that Daywalker needed to improve her clinical documentation and interpersonal communication skills. In August 2017, Dr. Szeremeta and the assistant program director, Dr. Farrah Siddiqui, met with Daywalker to discuss the importance of efficiency and accuracy in completing clinical documentation. Some of her supervisors reported that she displayed improvements after the meeting, as her first third-year evaluations provided that her "[r]enewed energy and positive, confident attitude have improved [her] clinical efficiency/documentation." However, other supervisors reported that her core competencies lagged behind her peers based on her clinical inefficiency and slow documentation.

In May 2018, UTMB conducted a routine audit of the department's medical documentation. The audit revealed that Daywalker had not completed records for five patients dating back to June 2017. Dr. Szeremeta questioned her about these records, and Daywalker responded that the patients "[l]eft without being seen" and should have been removed from the schedule. Upon further review, Dr. Szeremeta learned that Daywalker did see the five patients, and he became concerned that Daywalker "subsequently created notes and 'documentation'" to cover up her omissions. He believed that Daywalker had copied and pasted prior notes from other doctors without making any significant edits. His concerns about

No. 22-40813

Daywalker's clinical inefficiency led UTMB to place her on a remediation program.[1]

On May 30, 2018, Dr. Szeremeta notified Daywalker of her remediation plan and explained that her "lapses in professional behavior" have created difficulties for the faculty to trust in her competency. According to her evaluations for the first half of 2018, Daywalker scored a near eight out of ten for professionalism. On June 1, 2018, she submitted an internal complaint against Dr. Szeremeta, asserting that he created a hostile work environment and discriminated against her based on her race and sex. In her complaint, she alleged that Dr. Szeremeta made numerous disparaging comments during working hours in the UTMB emergency room, at public meetings among program residents, and at conferences that she attended. She further asserted that Dr. Szeremeta became fixated on her, consistently staring at her during working hours and consistently interrupting her work to give her negative feedback in full view of other employees and residents. Ultimately, Dr. Szeremeta was removed as her supervisor and replaced by Dr. Siddiqui.

Later that summer, she reached out to Dr. Vicente Resto, the department chair, to discuss being removed from the remediation plan. Due to personal conflicts with Dr. Siddiqui, Dr. Resto assigned her another supervisor to "help her pass the remediation and graduate from the residency program." In early August, Daywalker requested a four month "leave of absence." On August 8, 2018, UTMB sent her a letter approving her request and informing her that she would return to the program as a third-year

---

[1] UTMB describes remediation programs as a performance improvement plan "provid[ing] tailored assistance, training, and/or supervision to residents who need additional support to meet expectations" and not "formal discipline" or "report[ed] . . . to future employers."

resident upon the expiration of her leave. Dr. Harold Pine, a program faculty member, delivered the letter to Daywalker and informed her of additional concerns expressed by faculty members. The following day, Daywalker engaged counsel to submit a letter to request conversion of her "leave of absence" into protected leave under the Family and Medical Leave Act ("FMLA"). UTMB granted her FMLA leave the following week.

While on FMLA leave, Daywalker obtained records from the American Board of Otolaryngology which stated that UTMB reported she was a fourth-year resident on course to complete her residency in June 2020. She also consulted an attorney and requested disability accommodations upon her return to UTMB in November 2018. On November 6, 2018, her first day back, she met with Dr. Szeremeta and other program staff to discuss her status. Dr. Szeremeta informed her that she would have to repeat her third year during the 2018–2019 program year. Daywalker resigned that same day.

A few months later, Daywalker filed suit against UTMB and its then-president, Dr. Ben Raimer, in federal court. She alleged race- and gender-based discrimination claims under Title VII, FMLA, and the Rehabilitation Act. During discovery, Daywalker served UTMB with several discovery requests seeking comparator evidence, or information about the performance and discipline of the program's other residents. UTMB objected to those requests pursuant to the Federal Education Rights Privacy Act ("FERPA"). The district court then referred the request to compel to the magistrate judge. The magistrate judge determined that FERPA applied to UTMB's other residents because medical residency was "undoubtedly an academic undertaking that allows doctors to further their education and training in the medical field." However, the magistrate judge allowed the disclosure of residents' records, subject to the individual residents' objections. The

district court then issued an order directing the redaction of all identifying information and limiting the documents to counsel's eyes only.

Under the district court's directive, the parties submitted dispute letters addressing one of Daywalker's requests for production. Daywalker asserted that her request for production governed relevant comparator evidence from two program residents outside of her protected class, residents anonymously numbered three ("Resident Three") and sixteen ("Resident Sixteen"). UTMB argued that the requests did not encompass Resident Three's and Resident Sixteen's performance records. The magistrate judge received the letters after the final discovery deadline passed. Her request was denied because its language did not encapsulate the records of Resident Three and Resident Sixteen as the dates listed did not precisely match their program years. Thus, Daywalker proceeded with limited comparator information about only one other resident.

Upon UTMB's and Raimer's motion for summary judgment, the district court dismissed Daywalker's Title VII claims because (1) she failed to provide comparator evidence showing that another resident outside her protected class was treated more favorably;[2] (2) she provided insufficient evidence to show that her internal complaint of discrimination caused the program staff to hold her back; and (3) binding precedent required a greater degree of harassment beyond the insensitive remarks and microaggressions she alleged to prove a hostile work environment claim. The district court then dismissed her FMLA and Rehabilitation Act claims because she had not offered evidence of the causal links between (1) her request for FMLA leave

---

[2] The district court held that the other resident she pointed to was not similarly situated because he had different disciplinary issues and was in a different stage of the program's disciplinary process.

and informing UTMB of her disability status and (2) the decision to retain her as a third-year resident.

Additionally, the district court denied Daywalker's motion for sanctions based on spoliation of evidence and opposing counsel's conduct at depositions. She alleged that an internal investigator for UTMB deleted relevant notes and electronic recordings of meetings. The district court reasoned that there was no prejudice from the loss of the documents because UTMB produced the same material via another method and provided her with the minutes for the relevant meetings. The district court further concluded that "none of [her other claims] amount[ed] to sanctionable conduct." Daywalker timely appealed the magistrate judge's evidentiary decisions and the district court's order granting summary judgment in favor of UTMB and Dr. Raimer and denying her motion for sanctions.

## II. Discussion

On appeal, Daywalker contests the magistrate judge's determination that the program's residents were covered under FERPA and his denials of Daywalker's motion to compel, and the district court's denial of her motion for sanctions and grant of summary judgment in favor of UTMB. We address each challenge in turn.

### A. FERPA Order

We begin by discussing the magistrate judge's FERPA order determining that medical residents are students protected by the Act. "Issues of statutory interpretation are reviewed de novo." *Matter of Lopez*, 897 F.3d 663, 668 (5th Cir. 2018).

Daywalker avers that the magistrate judge "erroneously expanded FERPA to medical residents." She contends that "nothing in the limited legislative history of FERPA[] created rights for medical resident[s]." She

points out that the U.S. Department of Education ("DOE") has held that medical residents are not students covered by FERPA in a 1995 guidance letter.[3] Alternatively, she argues that the comparator documents she sought are not "'educational records' as defined by FERPA" because UTMB operates its residency programs independent of its medical and graduate schools as its records are not maintained like an educational institution. She further asserts that the FERPA order improperly creates new precedent citing unpublished and unpersuasive district court opinions in cases either not involving medical residents or cases where the resident did not argue that FERPA was inapplicable.

We disagree and hold that the magistrate judge did not err in applying FERPA to UTMB's medical residents. He began his analysis by stating that "[t]he scope of the term 'student' must be considered within the context of the specific [] statute before the court." *Univ. of Tex. Sys. v. United States*, 759 F.3d 437, 444 (5th Cir. 2014). He then noted that FERPA defines "education records" as "records, files, documents, and other materials which (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A). The Act defines a student as "any person with respect to whom an educational agency or institution maintains education records or personally identifiable information." *Id.* § 1232g(a)(6). FERPA defines an educational agency or institution as any entity that receives funds from any DOE program. *Id.* § 1232g(a)(3). The magistrate judge squarely addressed this issue and reasoned that UTMB's medical residents are students subject to FERPA's protections

---

[3] The DOE guidance letter provides that "[a] medical resident who works at a hospital is not a 'student' as that term is defined in FERPA" because they have achieved a terminal degree in their field and merely seek advanced certification.

because UTMB receives DOE funding and keeps personal records of their performance as they engage in practical educational curricula in pursuit of receiving a specialized certification.[4]

The magistrate judge noted that although this court has previously recognized that medical residents are classified as employees with respect to Social Security, Medicare, and federal payroll taxes, we have consistently maintained that those determinations were based on the government regulations or statutes at issue in those cases. *See, e.g.*, *Univ. of Tex. Sys.*, 759 F.3d at 444. The magistrate judge concluded that "medical residents are students for purposes of FERPA" because "a medical residency is undoubtedly an academic undertaking that allows doctors to further their education and training in the medical field." He also pointed out that several district courts have held the same, and thus there was "no reason to chart a new course" by holding opposite. Regardless of his construction of the statute, the magistrate judge's FERPA order did not impact Daywalker's access to the comparator information she needed to establish her discrimination claims. *See* 20 U.S.C. § 1232g(b)(2)(B); 34 C.F.R. § 99.31(a)(9)(i). The magistrate judge stated that her "requests for production and interrogatories seeking comparator information [were] directly relevant to her claims of discrimination" and that "it [was] appropriate to allow the disclosure of such material." FERPA merely imposes additional protection of students' records, allowing disclosure if made to comply with a court order. 20 U.S.C. § 1232g(b)(2)(B). Thus, we find no reversible error in the magistrate judge's FERPA order.

---

[4] UTMB stores and reports such information pertaining to its residents to the American Board of Otolaryngology. Shortly after completing the program, residents desiring to continue in the field must take and pass both written and oral exams. *See https://www.abohns.org/about-our-certifications/our-assessment-programs*.

No. 22-40813

**B. Discovery Determinations**

Having addressed the FERPA issue, we now turn to the magistrate judge's denials of Daywalker's request to compel and the protective order restricting the produced records to "counsel's eyes only." We review a district court's discovery decisions for abuse of discretion. *Williams v. Boeing Co.*, 23 F.4th 507, 514 (5th Cir. 2022). We "will reverse a discovery ruling only if it is 'arbitrary or clearly unreasonable,' and the complaining party demonstrates that it was prejudiced by the ruling." *HC Gun & Knife Shows, Inc. v. City of Houston*, 201 F.3d 544, 549 (5th Cir. 2000) (quoting *Mayo v. Tri-Bell Indus., Inc.*, 787 F.2d 1007, 1012 (5th Cir. 1986)). We hold that the record does not support a determination that the magistrate judge and district court abused their discretion either by (1) construing Daywalker's contested request to not describe the records of two of UTMB's residents with reasonable particularity or (2) by ordering that only her counsel could review the produced records in a modifiable protective order.

We begin with the magistrate judge's denial of her request for UTMB to produce comparator evidence. Daywalker asserts that the magistrate judge abused his discretion in denying her request for UTMB to produce comparator documents for two other residents in her class, Resident Three and Resident Sixteen.[5] Daywalker contends that we should not uphold the district court's decision because it failed to adhere to the liberal spirit of the Federal Rules of Civil Procedure and caused fundamental unfairness. UTMB counters that the magistrate judge reasonably construed the contested request for production and held that it could not be read to encompass the

---

[5] She avers that the abuse of discretion is facially apparent because the magistrate judge's FERPA order states that the records of other residents were "directly relevant to her claims of discrimination" such that it was appropriate to allow her to access other residents' records.

records for Residents Three and Sixteen because their class years did not match the requested years.

We hold that the magistrate judge reasonably construed the contested discovery request. The record shows that the district court reviewed the parties' position letters[6] and determined that although the information Daywalker sought may have been relevant to her claim, no request for production at issue encompassed the contested records for Residents Three and Sixteen. She requested all records of third-year residents from 2016 to 2017 and fourth-year residents from 2017 to 2018. UTMB posited that the contested information did not fall within the relevant period because Residents Three and Sixteen were third-year residents from 2017 to 2018. The magistrate judge and district court agreed. So do we.

We hold that the magistrate judge's interpretation of Daywalker's request for production was not arbitrary or clearly unreasonable. The magistrate judge noted that it was counsel's "obligation to make document requests that define[d] specifically what [Daywalker was] looking for" and rejected any "insinuation that this [determination was] somehow an effort to cut off [Daywalker]'s ability to proceed with her case" as "flat out incorrect." While courts have encouraged the liberal application of the Federal Rules of Civil Procedure in the interest of maintaining fairness to litigants,[7] the Rules also require parties to identify the documents they request with "reasonable particularity." FED. R. CIV. P. 34(b)(1)(A). In cases where we have admonished a district court for failing to order a party to produce comparator evidence, the error occurred from a failure to compel

---

[6] The parties submitted position letters describing the production dispute pursuant to the district court's directive.

[7] *See Hickman v. Taylor*, 329 U.S. 495, 506 (1947).

documents governed by or subject to a valid request for production. *See Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir. 1991). For instance, in *Coughlin v. Lee*, the district court declined to compel an employer to produce relevant personnel records in a wrongful termination case based on the plaintiffs' exercise of protected speech. *Id.* at 1158–59. The plaintiffs requested production of all personnel files for the relevant period of their discharges. *Id.* at 1158. Thus, we held that the district court's decision limiting discovery based on its determination of relevance constituted an abuse of discretion. *Id.* at 1159–60.

*Coughlin* is distinguishable, however, because the trial court's error there flowed from its refusal to compel the production of documents encompassed by the plaintiffs' requests without substantial consideration. *Id.* at 1160 ("The district court appears to have limited discovery because it considered these files irrelevant to the plaintiffs' freedom of speech case."). Here, there was no request encompassing the information and the district court provided a reasonable justification for its interpretation of the contested request. At the hearing, Daywalker argued that a denial of her request would allow UTMB to evade liability "because of some technical reading of" her request for production. To the contrary, the record shows that the shortcoming in Daywalker's case results from the imprecision with which the contested request was drafted, not the result of a mere technicality.

As written, Daywalker's requests could not be construed to incorporate the records of Residents Three and Sixteen because they were not third-year residents during the program year spanning from 2016 to 2017. And because they were not third-year residents from 2016 to 2017, it follows that they were not fourth-year residents from 2017 to 2018. For Daywalker to receive those documents, the magistrate judge would have had to re-write her document requests. On appeal, Daywalker cites no binding Fifth Circuit precedent for the proposition that a district court is obligated to reform a

party's discovery requests to encapsulate desired, relevant information. Thus, we hold that the magistrate judge and district court did not commit reversible error by denying her request for production, and subsequently denying her motion for reconsideration.

With respect to the district court's standing order, Daywalker's arguments also fail to demonstrate an abuse of discretion. She argues that the district court unfairly prevented her from reviewing the produced records of the other residents by limiting access to her counsel's eyes only. UTMB counters that Daywalker's substantial rights were not affected by the imposition of a standard protective order limiting access to confidential and sensitive information. It further argues that nothing in the disclosed performance records necessitated a medical degree or insider institutional knowledge to interpret them and that Daywalker "does not explain why it would take a medical doctor to ascertain whether the documents contained useful comparator information, and none is apparent from the record."

We again agree and find no reversible error. As aggrieved as Daywalker may feel from the dismissal of her claims against her employer, the record does not demonstrate that the district court abused its discretion by requiring her to abide by a protective order. She did not move to modify the order to assist her counsel, nor does she demonstrate that she could not sufficiently explain UTMB's performance standards and scoring data to her counsel to supplement her search for comparator evidence. Thus, we hold that the magistrate judge's and district court's discovery determinations did not constitute abuses of discretion. *See Williams*, 23 F.4th at 514.

### C. Motion for Sanctions

"We review a court's granting or denial of a motion for sanctions under an abuse of discretion standard." *Haase v. Countrywide Home Loans, Inc.*, 748 F.3d 624, 630 (5th Cir. 2014). We have consistently held that this

No. 22-40813

standard of review is "necessarily very deferential." *Jenkins v. Methodist Hosps. of Dall.*, 478 F.3d 255, 264 (5th Cir. 2007). Daywalker contends that the district court abused its discretion when it denied her motion for sanctions against UTMB and its counsel for the alleged spoliation of evidence and its counsel's alleged misconduct during depositions. Beyond referencing the allegations she made to the district court, Daywalker improperly attempts to incorporate the law and facts raised in her motion for sanctions by reference "[d]ue to word limitation[s] and the number of issues briefed in this case."

As a preliminary matter, we hold that the district court did not abuse its discretion in denying Daywalker's motion for sanctions. The district court concluded that any deleted records relevant to her claims were cured through the production of other evidence, such as the Committee's meeting minutes where the committee members discussed Daywalker. Furthermore, Daywalker did not brief the issue before the court in spite of our consistent holdings that a party must brief issues before us and cannot simply incorporate by reference their positions taken in district court.[8] *See, e.g.*, *Peel & Co., Inc. v. The Rug Market*, 238 F.3d 391, 398–99 (5th Cir. 2001). Nevertheless, even if we ignored her abandonment of the issue, there is no basis for reversal of the district court's determination. In line with our

---

[8] In her reply, Daywalker argues that incorporation by reference is permissible because "[t]here is no case law forbidding a party from citeimg [sic] or incorporating arguments already briefed and referenced in ROA [sic]." This ignores the Federal Rules of Appellate Procedure, Fifth Circuit rules, and our consistent and longstanding precedent that parties must brief their issues on appeal to obtain relief from this court. *See Yohey v. Collins*, 985 F.3d 222, 224–25 (5th Cir. 1993). Notably, Daywalker's counsel had other options. In accordance with the Federal Rules of Appellate Procedure and Fifth Circuit rules, counsel could have moved to file a brief in excess of the page or word-volume limitations to ensure adequate space to explain her arguments that sanctions are appropriate. *See* Fed. R. App. P. 32; 5th Cir. R. 32.4.

established principle to defer to a district court's denial to impose sanctions, we decline to reverse the district court's decision in this case. *See Jenkins*, 478 F.3d at 264.

### D. UTMB's Motion for Summary Judgment

We now turn to Daywalker's challenge to the district court's summary judgment to her Title VII, FMLA, and Rehabilitation Act claims. A district court's summary judgment is subject to de novo review. *Williams*, 23 F.4th at 512. We begin with Daywalker's claims that UTMB unlawfully retaliated against her for taking protected actions under Title VII, the FMLA, and the Rehabilitation Act, as they are reviewed under the same burden-shifting framework.

### i. Title VII Race Discrimination in Advancement Claim

Title VII prohibits an employer from "fail[ing] to or refus[ing] to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Our en banc court has recently made clear that a plaintiff is not required to suffer a permanent adverse employment decision to maintain a Title VII claim. *Hamilton v. Dallas County*, 79 F.4th 494, 502 (5th Cir. 2023) (en banc).[9] However, to establish a prima facie case of racial discrimination under Title VII, a plaintiff must demonstrate that she was "treated less favorably because of [her] membership in [a] protected class than were other similarly situated

---

[9] While the district court also held that Daywalker could not sustain her claim because no adverse employment action occurred, we note that she has preserved her claim of error in the district court and on appeal. Thus, Daywalker is entitled to the benefit of the substantive change of our Title VII jurisprudence that is congruent with her claim of error. *See Harrison v. Brookhaven Sch. Dist.*, 82 F.4th 427, 428 (5th Cir. 2023).

employees who were not members of the protected class, under nearly identical circumstances." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).

Where a plaintiff establishes less favorable treatment, an inference of racial discrimination is raised, and the burden then shifts to the employer to offer a legitimate nondiscriminatory explanation. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the employer provides such an explanation, "the burden shifts back to the [plaintiff] to demonstrate that the employer's explanation is merely a pretext for racial bias." *Id.*

Daywalker's Title VII claims fail to surpass the first hurdle, establishing a prima facie case of discrimination. To survive summary judgment, she must show that she was treated less favorably than similarly situated employees who were not members of her protected class, under nearly identical circumstances. *Paske v. Fitzgerald*, 785 F.3d 977, 985 (5th Cir. 2015). We have clarified that an appropriate comparator is an employee treated more favorably under the same circumstances or with "essentially comparable violation histories." *Lee*, 574 F.3d at 260. This court has consistently rejected arguments that proffered comparators need not be nearly identical, that is, need not share similar attributes or responsibilities to sustain a claim. *See Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018).

For instance, in *Saketkoo v. Administrators of Tulane Educational Fund*, we held that the plaintiff, a female physician, failed to establish a prima facie case for gender discrimination where she did not "present evidence that any male physicians shared her research responsibilities, section assignments, historical performances, or other attributes that would render them similarly situated." 31 F.4th 990, 998 (5th Cir. 2022). The *Saketkoo* panel determined that the standard to show discrimination is not met where a plaintiff offers no

explanation as to why the individuals are appropriate comparators. *Id.* at 999. The panel concluded that while she did identify that other male physicians, like herself, were not generating revenue from their practice, that alone was insufficient to render their experiences "nearly identical" in the field of academic medicine. *Id.* at 998–99.

Just like in *Saketkoo*, Daywalker cannot establish a prima facie case of discrimination by merely pointing to other residents that UTMB's faculty expressed concerns about. She has failed to show how their experiences in the field of practical medicine in Otolaryngology were "nearly identical." *See id.* Furthermore, her arguments on appeal offer little to no explanation as to how Resident Three is an appropriate comparator. *See id.* at 999. Daywalker asserts that Resident Three is similarly situated because UTMB "would have provided Resident [Three]'s records if this were not the case." She further asserts that "[i]t cannot be disputed in good faith that Daywalker has not met all elements of her race discrimination on her demotion and discharge claims." UTMB counters that the record shows that Resident Three's disciplinary history governed a vastly different faculty concern that she "[m]ay be having depth or eye/hand issues with endoscopic cases." In other words, Resident Three has a disciplinary history with no similarity to Daywalker's.

We hold that summary judgment was appropriate as to Daywalker's Title VII claims because she has not proven her prima facie case to raise the inference of racial discrimination. The district court noted that Resident Three did not have issues with the accuracy and punctuality of recording medical notes and "was in a different stage of the disciplinary process." Beyond making the bare assertion that Resident Three is an appropriate comparator, Daywalker offers no explanation of how Resident Three is similarly situated to her. *See Saketkoo*, 31 F.4th at 999; *see also Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("[A] party cannot

defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'"). Setting aside any possible issues of abandonment due to the limited discussion of this issue in her briefs,[10] we hold that Daywalker failed to adduce evidence of a comparator with comparable violation histories to raise an inference of racial discrimination. *See Saketkoo*, 31 F.4th at 999–1000. Ordinarily, the Title VII inquiry ends here because a plaintiff's "Title VII claims fail[] as a matter of law" where they are unable to prove a prima facie case of discrimination. *See Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017).

In the interest of completeness, however, we evaluate Daywalker's assertion that she has proven that UTMB's non-discriminatory justification was a pretext for racial discrimination. Assuming *arguendo* that her Title VII claims present a prima facie case of racial discrimination, her claims fail because she cannot demonstrate that UTMB's alleged non-discriminatory ground for termination—her untimely clinical notetaking—is merely pretextual. After presenting a prima facie case of discrimination, a defendant must offer a legitimate, non-discriminatory justification for the alleged discriminatory conditions. *See Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005). In that case, summary judgment is appropriate unless the plaintiff demonstrates that a genuine issue of material fact exists as to whether the proffered legitimate reasons are a pretext for discrimination. *Id.* Even if an employer's stated non-discriminatory justification lacks support, it does not violate Title VII if it acted on a reasonably held belief. *Dickerson v.*

---

[10] Federal Rule of Appellate Procedure 28(a)(4) requires that an "appellant's argument contain the reasons [she] deserves the requested relief with citation to the authorities, statutes and parts of the record relied on." *Weaver v. Puckett*, 896 F.2d 126, 128 (5th Cir. 1990) (internal quotations omitted). We have deemed arguments containing mere conclusory assertions without sufficient support from caselaw or the record abandoned. *See Yohey v. Collins*, 985 F.3d 222, 224–25 (5th Cir. 1993).

*Metropolitan Dade County*, 659 F.2d 574, 581 (5th Cir. Unit B 1981) ("Even if [the employer] w[as] wrong in its evaluation of the [employee's performance], it did not violate Title VII if it acted on a reasonable belief about [the conduct].").

On appeal, Daywalker asserts that she demonstrated pretext because (1) Dr. Resto admitted to her in a meeting in the summer of 2018 that "there was no validity to the remediation"; (2) she invalidated the reasons offered in Dr. Szeremeta's remediation memo with her own recounting of the events; and (3) Dr. Resto and Dr. Siddiqui said she was "passing" her remediation plan in July 2018. UTMB argues that any comment about the "validity" of the remediation plan does not establish a fact issue as to pretext because "the remediation and UTMB's decision to retain her as a [third-year resident] were separate acts, even if based on some of the same underlying conduct." UTMB further contends that no "fundamentally different" rationales exist to establish pretext through inconsistency and that Dr. Resto's comments "do not disprove that the faculty was concerned that 'her notes were untimely and inaccurate.'"

We conclude on these facts that the district court appropriately determined that Daywalker did not create a fact issue as to pretext. UTMB supervisors' comments on Daywalker's progress on her clinical charting skills during her first three years of residency are a mixed bag. Numerous comments for years two and three show that she did extremely well in certain rotations. However, the record also shows that numerous supervisors throughout the entirety of her time at UTMB commented on her need to improve her clinical notetaking skills and timeliness in recording patient notes. Daywalker admitted in her opposition to summary judgment that she did not complete some of the patient notes in a timely manner. In a July 2018 meeting with Dr. Siddiqui and Dr. Resto, Dr. Siddiqui informed Daywalker that she "continued to have lapses in documentation, [] was late on a call

note," and that her clinical efficiency skills lagged behind what was expected for a resident of her experience. Notably, UTMB's program requires senior residents to exhibit higher levels of clinical competency such that select positive reviews from years one and two cannot be said to be an accurate determinator that Daywalker would consistently meet expectations as she gained more responsibility. Numerous documents in the record support UTMB's stated justification that Daywalker had difficulties with the timely charting of patient notes.

Daywalker does not attack UTMB's reliance on its justification as unreasonable, which only further supports this conclusion. *See Baker v. Exxon Chem. Americas*, 68 F.3d 467 (5th Cir. 1995) (per curiam) (noting plaintiff's failure to show pretext or disprove reasonable reliance on stated justification for failure-to-promote claim did not merit reversal). Thus, summary judgment was appropriate as to her Title VII claims because she did not provide evidence creating a fact dispute as to pretext.

### ii. Title VII Hostile Work Environment Claim

Title VII also makes it unlawful to subject employees "to work in a discriminatorily hostile or abusive environment." *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019). To bring a hostile work environment claim, a plaintiff must show that they were harassed based on their status within a protected class in such a pervasive and severe manner to affect a term, condition, or privilege of employment. *See, e.g., West v. City of Houston*, 960 F.3d 736, 741 (5th Cir. 2020). A court must look at the totality of the circumstances to determine whether the alleged discriminatory conduct unreasonably interferes with an employee's performance, including the severity and frequency of the conduct and whether it is comprised of physical threats or humiliation, or are merely offensive utterances. *See Harris*

No. 22-40813

*v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993). The alleged hostile environment must be both objectively and subjectively offensive. *Id.* at 21–22.

Here, the objectively offensive requirement is determinative of Daywalker's claim. We have held that "[d]iscriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions" of employment and "create an abusive working environment that violates Title VII." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1049 n.9 (5th Cir. 1996) (citation omitted). One instance where the racially discriminatory remarks and intimidation crossed the line occurred in *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006). The district court in *Walker* granted summary judgment as to a Black employee's hostile work environment claims because it concluded that none of the comments were physically threatening or humiliating. *Id.* at 625–26. This court reversed because the district court ignored substantial evidence creating a fact dispute as to the severity and pervasiveness of the consistent use of racial epithets and derisive remarks against Black employees in the workplace over a period of three years.[11] *Id.* at 626.

---

[11] The panel summarized some of the evidence of the pervasive discriminatory animus as follows:

> The offensive remarks began in 1994, shortly after [plaintiff] was hired and had not ceased the week prior to the appellants' resignations in May of 1997. While working for [her employer], the [Black employees] at various times were subjected to: comparisons to slaves and monkeys, derisive remarks regarding their African heritage, patently offensive remarks regarding the hair of African–Americans, and conversations in which a co-worker and supervisor used the word "n*gger." The office manager also informed them that the vice-president did not want the African–American women to talk to each other.

*Id.*

No. 22-40813

Based on the evidence adduced at the district court, this is not such a case where the district court ignored years of derisive comments and intimidating behavior to grant summary judgment in UTMB's favor. The evidence presented in cases like *Walker* goes far beyond the conduct alleged here. At most, Daywalker has shown that Dr. Szeremeta made a handful of statements offensive to employees of color over the span of a few years. The insensitive statements are separated by months, and most involve instances where Dr. Szeremeta gave feedback or criticism about Daywalker's performance. However, the course of alleged racially insensitive treatment is less prolonged and pervasive than other cases where we determined that the plaintiff failed to show that they suffered from extraordinarily pervasive discriminatory conduct. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347–48 (5th Cir. 2007) (determining that no reasonable jury could find that the employer's consistent comments on "ghetto children" and Black employees' spending habits and family structure were sufficiently pervasive to create a hostile work environment). Therefore, we hold that summary judgment was appropriate as to Daywalker's Title VII hostile work environment claim.

### iii. Title VII Constructive Discharge Claim

A resignation is actionable under Title VII where it constitutes a constructive discharge. *Brown v. Kinney Show Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). To prove constructive discharge, the plaintiff must demonstrate that their "working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Faruki v. Parson, S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997). We have accepted certain events—demotions, reductions in salary or responsibilities, assignment to degrading work, badgering or harassment by an employer to encourage resignation, and offers to place them on early retirement—are evidence of circumstances where a reasonable employee would feel compelled to resign. *Brown v. Bunge Corp.*,

207 F.3d 776, 782 (5th Cir. 2000). "Constructive discharge requires a greater degree of harassment than that required by a hostile environment claim." *Kinney Shoe*, 237 F.3d at 566. Based on our constructive discharge jurisprudence and the reasons given above, we hold that Daywalker's constructive discharge claim also fails. *See id.*

Even absent our jurisprudence's ascription of a higher degree of harassment to maintain a constructive discharge claim, Daywalker's claim would nonetheless fail to survive summary judgment. For instance, in *Lauderdale v. Texas Department of Criminal Justice*, a female correctional officer alleged that her supervisor sexually harassed her over a period of four months while she worked in a state facility. 512 F.3d 157, 161 (5th Cir. 2007). The district court denied her constructive discharge claim because she did not present evidence that the sexual harassment was calculated to encourage her resignation or evidence of intentional animus to "create or perpetuate the intolerable conditions compelling resignation." *Id.* at 167 (quoting *Haley v. Alliance Compressor*, 391 F.3d 644, 650 (5th Cir. 2004)). The panel determined that the plaintiff "merely reiterated the facts that constituted harassment" and that her "failure to [adequately] brief and to correctly distinguish constructive discharge from her harassment claim [meant that] she ha[d] failed to create a genuine issue of material fact that a reasonable employee would have felt compelled to resign under the same circumstances." *Id.*

Daywalker's case is strikingly similar in terms of its deficiencies to the plaintiff's in *Lauderdale*. However, she asserts in her brief that hostile work environment claims and constructive discharge claims are functionally coextensive without noting the distinctions established by our jurisprudence. Her analysis, however, misses the mark. For these reasons, we hold that summary judgment in favor of UTMB as to Daywalker's constructive discharge claim was appropriate. *Id.* at 167.

### iv. Title VII Retaliation Claim

Daywalker's Title VII, FMLA, and Rehabilitation Act retaliation claims also fail here. We evaluate each of these claims under functionally similar structures based on the same *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 469 (5th Cir. 2021); *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 316 n.3 (5th Cir. 2007). To survive summary judgment, a plaintiff must demonstrate that "a causal link exists between the protected activity" and the complained of discriminatory "terms, conditions, or privileges of employment" or adverse employment action. *See Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014); *Hamilton*, 79 F.4th at 499–506 (eliminating the adverse employment action requirement from a prima facie case). Plaintiffs must prove their claims "according to traditional principles of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

On appeal, Daywalker argues that the close proximity of time between her internal discrimination complaint and the August 8, 2018 letter is evidence of a causal link between her protected activity and UTMB's discriminatory terms, conditions, and privileges of employment. She further asserts that Dr. Pine spoke to her as a representative of the Committee and faculty when he told Daywalker that she would never be an Otolaryngologist if she did not sign the remediation plan and that "a sizeable group in the faculty" thought she would not finish the program. She contends that because Dr. Pine made these comments during the pending investigations against Dr. Szeremeta and Dr. Siddiqui, "they are evidence a [sic] retaliatory animus of the faculty."

Daywalker brings a "cat's paw" argument, a theory of proving causation in discrimination cases by asserting that an individual with racially discriminatory animus infected the decision-making process. *EEOC v.*

*Emcare, Inc.*, 857 F.3d 678, 684 & n.3 (5th Cir. 2017). Here, she argues that Dr. Pine and Dr. Szeremeta asserted influence over the rest of the faculty to hold her back as a third-year resident. However, merely asserting a theory is not enough. We have held that a plaintiff pursuing this theory of causation must demonstrate that individuals with discriminatory animus "had influence or leverage over the official decisionmaker." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000). Beyond making these unsubstantiated allegations, Daywalker points to no specific evidence showing how Dr. Szeremeta and Dr. Pine tainted the deliberative process or had "influence or leverage" over the entire faculty. *See id.*

In fact, she does not include more than conclusory allegations that the evidence and allegations presented at the district court even satisfy the relevant standards. Therefore, we hold that summary judgment was appropriate to Daywalker's Title VII retaliation claim. *Nassar*, 570 U.S. at 360.

### v. FMLA Retaliation Claim

Daywalker also brings a retaliation claim under the FMLA. The FMLA prohibits retaliation against employees that exercise their FMLA rights. *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 527 (5th Cir. 2021). In her prima facie case, a plaintiff is required to demonstrate that she was treated less favorably than an employee who had not requested leave under the FMLA *or* that she suffered from discriminatory conditions of employment because she sought protection under the FMLA. *See id.* A plaintiff must provide evidence of a causal link, and her claim is subject to the *McDonnell Douglas* burden-shifting framework. *See Caldwell v. KHOU-TV*, 850 F.3d 237, 245–46 (5th Cir. 2017) ("[E]ven if the plaintiff makes out a prima facie case, he may not overcome a motion for summary judgment if the employer articulates a legitimate non-discriminatory reason for the employment action

at issue."). A plaintiff may use retaliatory comments to establish causation. *See Saketkoo*, 31 F.4th at 1001.

The reasons articulated in our analysis of her other claims demonstrate that Daywalker's FMLA claim also fails under the burden-shifting framework. *Caldwell*, 850 F.3d at 245. But in the interest of completeness and because the district court addressed these claims, we endeavor to address her arguments as to her FMLA retaliation claim.[12] Because she has not pointed to comparator evidence on her FMLA claim, we look to her other offered circumstantial evidence of causation. *See Saketkoo*, 31 F.4th at 1001. One of her primary arguments is that a short temporal link of a few months existed between her putting Dr. Resto on notice of her disabilities and the cause for her FMLA leave in a meeting in June 2018 and again in October 2018. She maintains that UTMB "did not notify [her that] she had been demoted until she returned from FMLA leave on November 6, 2018." She alternatively contends that Dr. Pine's statements made on August 8, 2018 that she would likely not finish the program if she did not agree to repeat select third-year rotations demonstrates retaliatory animus. Thus, she concludes that her proffered evidence in addition to the underlying "falsity of the remediation" plan is sufficient to establish a prima facie case.

We disagree. The record contains numerous sources that provide that UTMB's faculty decided to have Daywalker repeat certain third-year rotations before her request to convert her personal leave to FMLA leave was received. For instance, the Committee's August 6, 2018 meeting minutes show that the committee discussed holding Daywalker back as a third-year resident after she returned from leave. The August 8, 2018 letter was

---

[12] In her brief, Daywalker admits that the analyses for all of her retaliation claims are closely related and essentially advances the same arguments as to the causal link required to prove her prima facie case.

delivered on that date and stated that her leave was not considered FMLA. It follows that the letter explicitly stated so because the program staff did not know she sought FMLA leave.

UTMB points out that an employee is required to "provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." Daywalker's statement that she "thought [she] might qualify for FMLA" leave made to UTMB's administration in early August thus cannot be interpreted as sufficient verbal notice to trigger FMLA protection pre-dating the August 8, 2018 letter. Furthermore, Daywalker's exact words in her August 1, 2018 email requesting leave stated that "I would like to inform the [Graduate Medical Education] Office of my official request to take a leave of absence." Looking to her complaint, Daywalker averred that she engaged counsel to "draft[] a letter requesting FMLA [leave], among other things" *after* she received the August 8, 2018 letter. Thus, we hold that the record demonstrates that summary judgment in favor of UTMB was appropriate as to Daywalker's FMLA retaliation claim because she did not create a fact issue as to the causal link between her protected activity and the alleged discriminatory terms, conditions, or privileges of employment. *See Saketkoo*, 31 F.4th at 1001.

### vi. Rehabilitation Act Retaliation Claim

The Rehabilitation Act prohibits discrimination based solely on account of a person's disability. 29 U.S.C. § 794(a). Under the Rehabilitation Act, unlike Title VII, liability arises "only if the discrimination occurred 'solely by reason of [plaintiff's] disability,' not when it is simply a 'motivating factor.'" *See Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 585 (5th Cir. 2021) (quoting *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 505 (5th Cir. 2002)). Rehabilitation Act claims are also evaluated under the *McDonnell*

*Douglas* burden-shifting framework. *See id.* Because we have held that Daywalker has failed to show that UTMB's proffered non-discriminatory reasons for its decision were pretextual, her Rehabilitation Act claim also fails. *See id.* at 586 (denying Rehabilitation Act claim for the same reasons the plaintiff's FMLA claims were rejected because she incorporated her arguments together and admitted they were "intimately connected"). Notably, Daywalker's arguments that UTMB had notice of her disability as early as June 2018 do not square with the record or our caselaw. *See, e.g.*, *Hileman v. City of Dallas*, 115 F.3d 352, 353 (5th Cir. 1997); *Soledad*, 304 F.3d at 505. Throughout her brief, Daywalker offers only conclusory assertions that UTMB's conduct, whether it be through Dr. Pine, Dr. Szeremeta, the Committee, or the faculty at large demonstrates that her disability was the *sole* reason for her alleged discrimination. Thus, we hold that summary judgment was appropriate as to her Rehabilitation Act claim because she has not provided sufficient evidence of a causal link between the alleged discrimination and her disability status.

### III. Conclusion

In sum, we hold that (1) UTMB's medical residents are students covered by FERPA; (2) the district court did not abuse its discretion in making any discovery decisions in this case and in denying Daywalker's motion for sanctions; and (3) summary judgment was appropriate because Daywalker could not provide sufficient evidence to create a material fact dispute as to her Title VII, FMLA, and Rehabilitation Act claims. Thus, we AFFIRM.